832 A.2d 869

**D'Quinta A. UZZLE,**

v.

**STATE of Maryland.**

**No. 2722, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Oct. 2, 2003.

550

Margaret L. Lanier, Assistant Public Defender (Lori Connally, Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., on the brief), Baltimore, for appellee.

Argued before ADKINS, GREENE, and CHARLES E. MOYLAN, JR. (Ret., specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, Retired, Specially Assigned.

The appellant, D'Quinta A. Uzzle, was convicted by a Prince George's County jury, presided over by Judge William B. Spellbring, Jr., of two counts of first degree murder and one count of using a handgun in the commission of a crime of violence. On this appeal, he raises five contentions:

1. that Judge Spellbring abused his discretion in refusing to ask prospective jurors if they had such strong feelings about guns or gun owners that they might be unable to render a fair and impartial verdict;

2. that Judge Spellbring erroneously failed to suppress the appellant's involuntary statement;

3. that Judge Spellbring erroneously failed to give relief for a discovery violation when the State failed to supply the results of a voice stress analysis of a State's witness;

4. that Judge Spellbring erroneously failed to afford adequate relief after a witness referred to a lie detector test; and

5. that Judge Spellbring erroneously ordered the merger of a non-existent conviction.

Because the appellant has not challenged the legal sufficiency of the evidence to support the verdicts, it is unnecessary for us to recount the circumstances of the crime, except to the limited extent to which the circumstances have some bearing on one or more of the contentions.

## The Voir–Dire Examination

The only fact about the crimes that has any possible bearing on the appellant's first contention is that he was convicted of two murders, the modality of which was the shooting of the victims by the appellant with a handgun. Accordingly, the appellant was interested in the attitudes of the jurors about guns.

At the conclusion of the voir dire questioning by the court, Judge Spellbring asked defense counsel if he had any "exception to either what I did give or what I did not give." Counsel replied:

On page [13–14] of the voir dire, what I proposed there is a series of questions on guns and weapons. I would ask the Court to ask the jurors if they have any strong feelings regarding people who own guns and if they have any strong feelings either for or against gun control, if they have any specific fear of guns that might affect their judgment in a

case where the evidence showed that the decedent died of gunshot wound.

That exchange had reference to appellant's proposed voir dire question # 8. To be sure, defense counsel then followed his express objection to the court's failure to give question # 8 with an apparent but halting and ambiguous reference to question # 9, and Judge Spellbring expressly stated, "I'll decline to ask the questions cited by the defense in their voir dire, subtitled eight and nine." Both the appellant's subtitling of his first contention and all of his argument in support of it, however, has reference only to proposed voir dire question # 8, and we shall confine our analysis exclusively to it. Proposed question # 8, entitled "Guns/Weapons," was actually the following set of questions:

A. Does any juror have any strong feelings regarding people who own guns?

If so, what are they?

B. Does any juror believe that it is a good idea to keep a gun for self-protection?

C. Does any juror have any strong feelings about people who keep handguns and ammunition in their homes? If so, describe.

D. Does any juror have any strong feelings about people who carry handguns?

If so, describe.

E. Is there any juror having strong feelings either for or against gun control? If so describe those feelings.

F. Do you have any specific fear of guns that might affect your judgment in a case where the evidence showed that the deceased died of a gun shot wound?

G. Has any juror, or his or her family or household member, received any training in the use of a handgun?

## A. *Dingle's* Non–Retroactivity Is immaterial

The appellant relies almost exclusively on *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), for his argument that Judge

Spellbring committed error in declining to ask the set of questions requested in proposed voir dire # 8. At oral argument, we became distracted by the issue of whether *Dingle v. State*, filed on September 15, 2000, announced "new law," and, if it did so, whether it should be applied retroactively to this case, which became "final" on December 19, 1998, thirty days after the appellant's sentences were imposed with no appeal to this Court having been filed. Maryland Rule 8–202(a) and (f).[1] The *Dingle* filing, therefore, did not come until almost two years after this case had become final.

On taking a second look at *Dingle v. State*, however, we are persuaded that it does not even speak to the voir dire issue in front of us, quite aside from any question of its non-retroactivity. Although our tentative opinion is that *Dingle* would not apply retroactively to this case, which was final long before *Dingle* was filed, we are relieved of any necessity of making a close analysis of the issue because of our further and considered conclusion that *Dingle* could not help the appellant on the merits of this contention even if it did apply.

### B. *Dingle's* Concern With the Modality of the Questioning

The *Dingle* opinion did not devote any analysis to or even discuss the substantive merits of the voir dire questions before it. Assuming the questions to have been a proper subject for voir dire inquiry, its exclusive concern was with the two-part nature of the questions and the attendant instruction that the prospective jurors should only respond if their answers were in the affirmative to both parts of the questions. At the very outset of the opinion, the Court of Appeals set forth the "issue this case presents":

---

1. That Judge Steven I. Platt on February 8, 2002, granted the appellant partial post-conviction relief by permitting this belated appeal does not affect "finality" for purposes of measuring retroactivity. *Greco v. State*, 347 Md. 423, 432 n. 4, 701 A.2d 419 (1997); *Brady v. Warden*, 2 Md.App. 146, 148–49, 233 A.2d 378 (1967).

In his Petition for Writ of Certiorari, the petitioner asked this Court to address the following question:

> *"Did the lower court err in approving,* over defense objection, *a method of voir dire (a two-part question, respond only if your answer to both parts is in the affirmative)* which made the jurors, rather than the trial judge, the final arbiter of impartiality and prevented defense counsel from exercise of his challenges for cause?"*

361 Md. at 3 n. 1, 759 A.2d 819 (emphasis supplied).

Even if we were to attribute to the seven subjects of inquiry the implicit approval of the 4–3 majority in *Dingle,* moreover, the subject matter of those inquiries did not remotely involve the subject matter of the appellant's requested voir dire # 8 in this case. *Dingle* summarized, 361 Md. at 3 n. 3, 759 A.2d 819, the substance of the respective inquiries in that case.

> The areas of concern to the petitioner, about which the petitioner asked the court to inquire, were: 1) experience as a victim of crime; 2) experience as an accused or convicted person; 3) experience as a witness in a criminal case; 4) experience as a petit juror in a criminal case or as a member of a grand jury; 5) membership in any victims' rights group; 6) connection with the legal profession; and 7) association with law enforcement.

The inquiries in this case were all about attitudes about 1) guns, 2) gun owners, and 3) gun control.

The thrust of the *Dingle* opinion, far from concentrating on the subject matter of the inquiries, was that by obscuring a prospective juror's affirmative answer to the first inquiry unless the answer to the second inquiry was also in the affirmative, the ultimate decision as to juror bias would be thereby improperly delegated by the judge to the prospective juror himself. The *Dingle* majority, 361 Md. at 5, 759 A.2d 819, explained the manner in which the jurors had been instructed to respond:

> You should only stand if your answer is "Yes" to both parts of the question. If your answer is "No" to either part of the

question, then you should not stand. So once again, only stand if your answer is "Yes" to both parts of the question.

The Court summarized, 361 Md. at 8, 759 A.2d 819, the defense argument as to the prejudicial nature of such an instruction:

The petitioner objected to the use of the two-part format on a number of grounds, principally because he believed, and therefore argued, that *asking compound questions and requiring an answer only if the prospective juror thought that he or she could not be fair, would, and, in fact did, result in a jury in which the venire persons themselves, by "unilateral decision," determined their fitness to serve on the jury.*

(Emphasis supplied). The *Dingle* holding focused on the impropriety of such a procedure:

We shall hold that the voir dire procedure utilized in this case usurped the court's responsibility in this regard.

361 Md. at 8–9, 759 A.2d 819.

The *Dingle* opinion assumed that the trial judge in that case recognized a logical connection between the answers to the first part of the questions and the jurors' ability to be fair and impartial but then denied himself that necessary predicate knowledge for deciding a challenge to a juror's fairness and impartiality in all cases where a prospective juror answered the second part of the questions in the negative.

*[T]he trial judge in this case apparently recognized the relevance* of the experiences and associations to the venire persons' qualification to serve on the jury. Thus, rather than inquiring into the prospective juror's mind set in a vacuum, *the trial judge, presumably* understanding that "it is the correlation between the juror's status and his or her state of mind that is dispositive when the venire person's status [or experience] is relevant to his or her bias," *linked the question whether the venire person could be fair and impartial with the venire person's status or experience.*

361 Md. at 17, 759 A.2d 819 (emphasis supplied).

The majority opinion in *Dingle* simply took as a given that the trial judge recognized the relevance of the questions to the

discovery of likely bias but nonetheless deferred to the jurors' own judgments as to whether their bias should disqualify them.

> [T]he trial judge recognized the relevance of the questions, that they were designed to uncover prejudice that would, if not discovered, deny the petitioner a fair trial. Expediency and the perceived need to limit the process, however, led the court to find a way to avoid examination of each affected venire person as to the admittedly relevant matters and allow each such person to make his or her own call as to his or her qualification to serve.

361 Md. at 14, 759 A.2d 819 (emphasis supplied).

Chief Judge Bell explained how the lack of information, resulting from the two-part nature of the questioning, would render a judge incompetent to make an informed decision as to a challenge.

> The trial judge's mistake was that he failed to appreciate that, should there be a challenge, he had the responsibility to decide, based upon the circumstances then existing ... whether any of the venire persons occupying the questioned status or having the questioned experiences should be discharged for cause.... Because he did not require an answer to be given to the question as to the existence of the status or experience unless accompanied by a statement of partiality, the trial judge was precluded from discharging his responsibility, i.e. exercising discretion, and, at the same time, the petitioner was denied the opportunity to discover and challenge venire persons who might be biased.

361 Md. at 17, 759 A.2d 819 (emphasis supplied).

## C. The Obvious Limits on the *Dingle* Rationale

As the *Dingle* opinion itself makes clear, however, that rationale must be applied with a delicate sense of balance, lest every proposed voir dire question be deemed mandatory. Pushed to a logical extreme, the *Dingle* approach, unrestrained, could produce such a clearly unintended result. The answer to any proposed voir dire question could, in the hands

of an overzealous advocate, be made the basis of a challenge for cause, notwithstanding that the challenge might be far-fetched. The argument could be pushed that the judge needed the benefit of the answer in order to rule properly on the challenge. At that point, a trial judge, instead of enjoying the broad direction classically entrusted to him, could only deny a proposed voir dire question at the very high risk of reversal. *Dingle* obviously did not go that far. *Dingle*, 361 Md. at 14, 759 A.2d 819, recognized the inherent tension between conflicting goals.

> As *Davis*, and now this case, demonstrate, there may be, and often is, a conflict between keeping the voir dire process limited and the goal of ferreting out cause for disqualification.

Far from abandoning Maryland's traditional approach, *Dingle* in major measure reaffirmed it.

> *Maryland has adopted, and continues to adhere to, limited voir dire.* It is also well settled that *the trial court has broad discretion in the conduct of voir dire,* most especially with regard to the scope and the form of the questions propounded and that *it need not make any particular inquiry of the prospective jurors unless that inquiry is directed toward revealing cause for disqualification.*

361 Md. at 13–14, 759 A.2d 819 (emphasis supplied).

*Dingle*, 361 Md. at 14, 759 A.2d 819, both cited and quoted with approval from *McGee v. State*, 219 Md. 53, 58–59, 146 A.2d 194 (1959). *McGee* is particularly pertinent to the gun-related voir dire questions in issue here. In *McGee* the Court of Appeals affirmed the decision of the trial judge not to ask five questions. Three of those five questions are tantalizingly close in their area of interest to the proposed questions at issue in this case.

1. Do you believe that a man defending his life has a right to use any weapon or weapons at his disposal?
2. Do you believe that possession of a gun makes a man liable for any consequence which the possession of the gun may have?

3. Would the fact that a defendant had illegal possession of a gun prevent you from finding him "Not Guilty" of a homicide which involved said gun, if all or a reasonable amount of the other evidence brought before you indicated his innocence?

219 Md. at 58, 146 A.2d 194. In affirming the trial judge's decision not to ask those questions, Judge Hammond said (and the *Dingle* opinion quoted):

*Questions* not directed to a specific ground for disqualification but *which are speculative, inquisitorial, catechising or "fishing"*, asked in aid of deciding on peremptory challenges, *may be refused in the discretion of the court*, even though it would not have been error to have asked them.

219 Md. at 58–59, 146 A.2d 194 (emphasis supplied).

*Burch v. State*, 346 Md. 253, 696 A.2d 443 (1997), was another case cited by *Dingle*, 361 Md. at 14, 759 A.2d 819. The question at issue in *Burch* went to the ability of the jurors to consider a mitigating factor in the sentencing phase of a capital case.

"In considering whether to impose a life sentence with or without the possibility of parole or a death sentence, would you be able [to] consider as mitigating the fact that [appellant] was abused as a child?"

346 Md. at 292, 696 A.2d 443. The appellant alleged that the question went directly to what could have been a "bias that is cause for disqualification."

Though acknowledging that the scope and content of voir dire examination is largely within the discretion of the trial court, he avers that his question was framed to identify jurors "with a bias that is cause for disqualification" and that, as a result of the court's refusal to ask it, "one or more of the jurors may have refused even to consider, as a mitigating factor, evidence that [appellant] was abused as a child."

346 Md. at 293, 696 A.2d 443.

In nonetheless affirming the decision of the trial judge not to ask the question, Judge Wilner concluded:

A defendant has no right to question prospective jurors, under the guise of searching for disqualifying bias, to see who might be receptive to any of the myriad of potential mitigating factors he or she may choose to present.

346 Md. at 295, 696 A.2d 443.

Also cited by *Dingle,* 361 Md. at 14, 759 A.2d 819, were *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33 (1996) ("[W]e have emphasized many times before that 'the scope of voir dire and the form of the question propounded rest firmly within the discretion of the trial judge.' "); and *Hill v. State,* 339 Md. 275, 278–79, 661 A.2d 1164 (1995) ("[I]n Maryland, the principles governing jury voir dire are well settled. Of course, the nature and extent of the voir dire procedure, as well as the form of the questions propounded, are matters that lie initially within the discretion of the trial judge.").

Just as the trial judge may not delegate to a prospective juror the decision as to whether the juror is qualified to serve, neither may the trial judge delegate to defense counsel the decision as to whether a particular line of inquiry may likely reveal juror partiality or bias. *Perry v. State,* 344 Md. 204, 686 A.2d 274 (1996), was also cited by *Dingle,* 361 Md. at 13, 759 A.2d 819. In *Perry,* Judge Rodowsky pointed out that, as a necessary restraint on the process, the trial judge must assess whether there is a reasonable likelihood that a given line of inquiry will reveal a basis for disqualification.

Consequently, Perry's contention really is addressed to *whether the inquiries requested* by him *were "reasonably likely to reveal cause for disqualification,"* based upon partiality or bias. *Davis,* 333 Md. at 35, 633 A.2d at 871. Under the circumstances of the instant matter, there was not "a demonstrably strong correlation between the status in [Perry's expanded *voir dire* ] question and a mental state [of a venireperson] that gives rise to cause for disqualification."

344 Md. at 218–19, 686 A.2d 274 (emphasis supplied).

Absent such a reasonable likelihood, there is no necessity to pursue the inquiry, notwithstanding the possibility that some conceivable basis for disqualification might be revealed.

A trial court's process of determining whether a proposed inquiry is reasonably likely to reveal disqualifying partiality or bias includes *weighing the expenditure of time and resources* in the pursuit of the reason for the response to a proposed *voir dire* question *against the likelihood that pursuing the reason for the response will reveal bias or partiality.*

344 Md. at 220, 686 A.2d 274 (emphasis supplied).

### D. Judge Spellbring's Decision in this Case

■ It was within Judge Spellbring's discretion to assess that reasonable likelihood, described by *Perry,* in this case. Looking at the set of questions embraced by the appellant's voir dire request # 8 as a totality, it is clear that the appellant sought a far-ranging, almost open-ended, exploration of juror attitudes, experiences, and philosophies that might have been of immeasurable value in guiding the appellant's use of his peremptory challenges. A quick revisiting of four of the subsumed seven questions reveals how open-ended, and how potentially wide-ranging and time consuming, they could potentially have been.

A. Does any juror have any strong feelings regarding people who own guns?

*If so, what are they?*

. . . .

C. Does any juror have any strong feelings about people who keep handguns and ammunition in their homes? *If so, describe.*

D. Does any juror have any strong feelings about people who carry handguns?

*If so, describe.*

E. Is there any juror having strong feelings either for or against gun control? *If so describe those feelings.*

(Emphasis supplied).

In deciding whether Judge Spellbring abused his discretion in declining to ask the appellant's requested voir dire # 8, it is illuminating to look at the larger context of which requested

voir dire # 8 was a part. The appellant had submitted to the court ten such sets of questions, filling seventeen typed pages, and consisting of approximately one hundred individual questions plus numerous attendant requests for elaboration. The requested voir dire in this case was not in line with the limited voir dire traditionally, and still, practiced in Maryland. As listed in *Dingle*, 361 Md. at 10 n. 8, 759 A.2d 819, there are certain limited areas of inquiry that are mandatory.

This Court has identified areas of mandatory inquiry: [1] racial, ethnic and cultural bias, [2] religious bias, [3] predisposition as to the use of circumstantial evidence in capital cases, and [4] placement of undue weight on police officer credibility. *Davis v. State* explained that these mandatory areas of inquiry involve "potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them."

The line of inquiry contended for by the appellant in this case did not remotely involve any of those four sensitive areas of mandatory inquiry.

The appellant secondarily relies on the two post-*Dingle* cases of *State v. Thomas*, 369 Md. 202, 798 A.2d 566 (2002), and *Sweet v. State*, 371 Md. 1, 806 A.2d 265 (2002). Unlike the very peripheral probing of attitudes in this case, the critical question in *State v. Thomas*, 369 Md. at 204, 798 A.2d 566, went directly to the question of juror bias and unequivocal disqualification.

"Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws *that it would be difficult for you to fairly and impartially weigh the facts at a trial* where narcotics violations have been alleged?"

(Emphasis supplied). The critical question that was not asked in *Sweet v. State*, 371 Md. at 9, 806 A.2d 265, similarly went straight to the heart of juror disqualification.

"Do the charges stir up strong emotional feelings in you that would affect your ability to be fair and impartial in this case?"

We hold that in declining to propound appellant's requested voir dire # 8, Judge Spellbring did not abuse the broad discretion still entrusted to him in such matters.

## The Voluntariness of an Oral Admission

■ The appellant also contends that Judge Spellbring erroneously failed to suppress his confession. Before we become hopelessly enmired in a weighty discussion of confession law, it behooves us to note the significant limitations on the issue in this case.

## A. The Limited Nature of the Contention

Simply to put the issue in perspective, what is before us is not a *signed or written statement* but several brief oral responses and/or emotional reactions to several questions asked of the appellant by a police interrogator. What is involved, moreover, is not a *confession* of guilt in any sense of the word, but several admissions or reactions of more circumstantial import.

There are several other limitations as well. The murders in this case took place on the streets of Prince George's County at approximately 2:30 A.M. on the morning of October 13, 1996. Detective Sergeant Dwight Deloatch, of the Prince George's County Police Department, ultimately interviewed the appellant on two occasions. The first occasion was on August 21, 1997, ten months after the crimes, and at the Rockwall County, Texas, Detention Center, about twenty miles southeast of Dallas. The appellant was under arrest there on charges of felony marijuana possession. Although a warrant for the appellant's arrest for murder in Maryland had been issued on October 16, 1996, he was not located by the Prince George's County Police Department until a "crime solver's tip" on July 21, 1997, alerted them to the fact that he was in jail in Texas under an alias. A subsequent fingerprint

check verified his identity. The second interview was on October 3, 1997, in Prince George's County, immediately following the appellant's waiver of extradition to Maryland and the service on him of the Maryland arrest warrant for murder.

Although at the September 9, 1998, suppression hearing before Judge Spellbring, the appellant formally challenged the voluntariness of any of his responses to both 1) the August 21 interrogation in Texas and 2) the October 3 interrogation in Maryland, on this appeal he only challenges the voluntariness of his responses to the October 3 interrogation in Maryland.

By way of a further limitation, the appellant concedes that the federal constitutional requirements pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were fully complied with, both in Texas and in Maryland. The contention, therefore, is now limited to the claim that the appellant's allegedly compromising responses on October 3 were not voluntary within the contemplation of Maryland common law.

One final limitation is that the appellant is objecting only to the ruling of Judge Spellbring at the conclusion of the suppression hearing. Although both the admissibility and the weight of the appellant's responses to Sergeant Deloatch could have been challenged before the jury, they were not. The motion to exclude the appellant's "statement" was not renewed. The cross-examination of Sergeant Deloatch at the trial on the merits, moreover, did not challenge or seek to erode in any way the voluntariness of the appellant's October 3 responses to him. No jury instruction was sought or given on the subject of whether 1) the jury should consider or 2) how it should weigh the appellant's responses.

Indeed, one exchange between Judge Spellbring and counsel just after the jury instructions had been given casts the entire contention into doubt. Judge Spellbring first asked the State if it had any exceptions to any instructions he had either given or not given. The State had two such exceptions, the second of which is of current interest.

Second of all, *defense counsel stipulated that his client's statements were voluntary.* If you look at the instruction on statement of a defendant, they go through a litany to determine if they were voluntary. I think that needs to be—*I think the fact that the statements are voluntary and that the defendant is conceding that they're voluntary has to be made to the jury.*

(Emphasis supplied).

The exchange at the bench then wandered off into a discussion of the State's first exception but finally returned to the apparent concession as to voluntariness.

MS. ALVES: My second was you were going to give an instruction that *the statements that the defendant made were voluntary.*

THE COURT: *It's not an issue.*

MR. TRAINOR: *I will not argue that.*

THE COURT: It is not an issue.

MS. ALVES: Okay.

(Emphasis supplied).

Because that apparent concession as to voluntariness may not have been an ultimate concession for all purposes (we cannot tell) but only a more limited procedural concession, within the context of jury instructions and jury argument, we shall entertain the appellant's challenge to Judge Spellbring's ruling at the suppression hearing as an issue still properly before us.

We shall consider Judge Spellbring's ruling in terms of the traditional assessment of voluntariness, which is all that was raised or argued before Judge Spellbring. Indeed, at the conclusion of the suppression hearing, the sum total of the statement made by defense counsel was:

Your Honor, I have explained to my client his right to testify at this hearing, and he does not wish to do so, so *we will rest.* And I can tell you *I will submit on the issue of whether the State has made a prima facie case* by a preponderance of the evidence *on the issue of* compliance

with Miranda and *voluntariness,* and ask the Court to just consider the totality of the circumstances.

(Emphasis supplied).

## B. The Appellant's October 3 Responses That Are In Issue

At about 4:30 P.M. on the afternoon before the murders, 1) the appellant; 2) Kenneth Smith; and the two ultimate murder victims, 3) Clinton Roberts and 4) Parris Mickens were "hanging around" on Nova Street in the Capitol Heights area of Prince George's County. A female cousin of the appellant was insulted by Roberts and the appellant took offense at the insulting remark. An argument ensued and Roberts at one point threatened to get his Glock, a type of handgun.

The argument subsided, however, and the group adjourned. The same four males gathered again between approximately 8 P.M. and 10 P.M. They talked and they drank alcohol. The key State's witness, Kenneth Smith, testified to the foregoing narrative, and the appellant, in his statements of August 27 and October 3, readily acknowledged that that much of the narrative was true. The respective versions of events parted company diametrically, however, as to what happened after 10 P.M.

Smith testified that the foursome remained together and went to buy marijuana at about 2:30 A.M. As the four stopped at one point to pool their money, the appellant, according to Smith, suddenly pulled a silver .357 revolver and shot both Roberts and Mickens. Smith fled the scene and did not see the appellant again.

On both August 27 and October 3, the appellant, without hesitation, acknowledged the pre–10 P.M. part of Smith's narrative. He steadfastly insisted, however, that he left the group at about 10 P.M. and never returned. The appellant consistently denied having shot Roberts and Mickens.

The only thing that happened in the October 3 interrogation that was not an essential replay of the August 27 interrogation

in Texas was the following response of the appellant at about 10:10 P.M. Sergeant Deloatch testified:

> He kept denying that he, that he shot anybody. And I asked him, the statement that I got from Jo–Jo [Kenneth Smith], was Jo–Jo telling the truth? And he said, no, and I asked him what he meant and he just dropped his head. He didn't really say anything. And he kept telling me—the more I kept talking to him about the subject, he kept telling me he had nothing to say. So I just kept talking to him and just kept talking to him. And basically he just got somewhat emotional. He dropped his head down and tears began to come to his eyes. And I asked him was he sorry for the death of the two guys? And he dropped his head and he said yes. And then he also told me that he knew he had messed up his life. And he further told me that I had Jo–Jo's statement.

## C. The Test Remains One of Voluntariness

■ The test of admissibility of a defendant's statement under Maryland law remains, as it always has been, traditional voluntariness. As Judge Wilner explained in *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003):

> *The test* under the statute, and under the Constitution, *remains voluntariness. Deliberate violations of the rule,* as we shall explain, bear heavily on whether a resulting statement is voluntary, but they *do not, of themselves, form an independent basis for rendering inadmissible a statement that is otherwise voluntary* and admissible. To conclude otherwise would be tantamount to ignoring the statute, which, in the absence of some Constitutional defect, we are not permitted to do.

(Emphasis supplied).

## D. Judge Spellbring's Findings and Ruling

Judge Spellbring ruled that the appellant's responses to Sergeant Deloatch on October 3 were voluntary. He made assessments of credibility and findings of fact supportive of his ruling. Both the ruling and the findings are entitled, of

course, to great deference by us. With respect to the October 3 interrogation, Judge Spellbring found and ruled:

This is the defense motion to suppress [an] oral statement made by Mr. Uzzle ... in Maryland on October 3, 1997.

*I have had an opportunity to observe* the State witnesses, *Detectives Deloatch and Clark.* Having had that opportunity, *I find that they are credible witnesses.* And based on their testimony, I find the following facts:

I further find that on October 3, 1997 Mr. Uzzle, once again, was advised of his rights pursuant to State's Exhibit Number 3 and the testimony of Detective Deloatch. Once again, *based on my finding of Detective Deloatch to be credible* in his testimony as well as State's Exhibit Number 3, *I find that Mr. Uzzle knowingly, intelligently, and voluntarily waived the rights that were explained to him by Detective Deloatch* and evidenced on State's Exhibit Number 3, and waived those rights; again, based on the testimony of Detective Deloatch in State's Exhibit Number 3.

I further find that the statements made by Mr. Uzzle, the oral statements made by him on October 3, 1997, were voluntary only after a waiver of his Sixth Amendment rights under the Miranda decision as evidenced both by State's Exhibit Number 3 and State's Exhibits Number 4.

*I find no evidence of any promises, threats, or inducements to warrant the statements to be involuntary.*

Based on those findings of fact and conclusions of law, I will deny the defense motion to suppress the oral statement made by Mr. Uzzle on October 3rd.

(Emphasis supplied).

■ These findings were not clearly erroneous, and the ruling based upon them was not in error.[2]

2. Although the appellant tosses into the argument before us the State's alleged violation of the prompt presentment rule under Maryland Rule 4–212, he never argued this factor before Judge Spellbring. · It could open for consideration a vast and complex subject that was never alluded to before Judge Spellbring. We hold that it has not been preserved for appellate review.

### E. Supportive Testimony and the Absence of Countervailing Testimony

With respect to the voluntariness of the October 3 responses of the appellant, only two witnesses were called to shed any light on the subject. Sergeant Glenn Clark, who administered a voice stress analysis test to the appellant, was with the appellant from approximately 9 P.M. until shortly after 10 P.M. on October 3. Although Sergeant Clark's involvement with the appellant was minimal, his observations are nonetheless pertinent:

Q During this time that you were reading him his statement, the waiver, did you promise him anything to get him to waive his rights?

A No, I did not.

Q Threaten him in any manner?

A No, I did not.

Q Coerce him in any way?

A No, I did not.

Q Did he ever, during the time that you were advising him of his rights, ask for an attorney?

A No, he did not.

Q Did he ever say that he wanted to stop the questioning?

A No, he did not.

Q Did he ever make any request of you?

A No, he did not.

Q Did he appear to understand what he was doing?

A Yes, he did.

Q What was his demeanor at the time?

A He was very cordial. I didn't have any problem with him. He was polite.

Q Did he appear alert?

A Yes, he did.

The primary witness to the appellant's psychology on October 3 was Sergeant Deloatch, who was the lead investigator on

the case and who conducted the interrogation of the appellant on that day. He testified first to the appellant's situation at about the time the interrogation began.

Q During the time of advising him of his rights on October 3rd, did you threaten him in any manner?

A No, I did not.

Q Did you promise anything to get him to waive his rights?

A No, I did not.

Q Did you coerce him in any manner?

A No, I did not.

Q Did he ask for an attorney at any time during advising him of his rights on October 3rd?

A No, he did not.

Q Did you ask him any questions regarding his rights after you advised him of his rights on October 3rd?

A No, I did not.

Q On the October 3rd waiver, did he also—where it says, "signature of person making the statement," he signed that?

A Yes, he did.

Q And, again, indicated his education?

A Grade ten.

Q As to the checks on the questions of the yes and no, do you understand these rights, do you want to make a statement and the like, did he actually make those checks?

A Yes, he did.

Q And I see a notation of DAU for initials. Did he write those initials?

A Yes, he did.

Q And during this time he asked you no questions?

A No, he didn't ask me no questions.

Q And he never requested an attorney?

A No, he did not.

Sergeant Deloatch further testified both to his own conduct and to the appellant's reactions at the time the appellant later made the responses now in issue.

Q And during this time when he made the statements to you regarding being sorry for the death of the two guys, did you promise him anything to make those statements?

A No, I did not.

Q Threaten him?

A No, I did not.

Q Did he ever ask for an attorney?

A No, he did not.

Q Did he go to the bathroom, or was provided any food during this time, to your knowledge?

A Yes, he was taken to the bathroom around 5:30 p.m.

Q Provided any food to your knowledge?

A I'm sure I asked him if he wanted anything to eat. And I don't have it in my log that I gave him anything, because usually when he want anything to eat. I put it in my log.

As opposed to that fully credited testimony as to voluntariness, there was no testimony as to involuntariness, although the best possible source of such testimony was sitting mutely at the trial table. It is curious that a fact-finding suppression hearing judge should be invited to speculate on the effect of external stimuli on a defendant's psyche when the defendant himself declines to say anything about that effect. The observation of this Court in *Ashford v. State,* 147 Md.App. 1, 56, 807 A.2d 732 (2002), is appropriate here.

When the issue is voluntariness, *the failure of a defendant to testify almost forecloses any chance of prevailing. The voluntariness of a defendant's response to possible pressures, on the other hand, is very subjective. Only the defendant can truly tell us what was going on in the*

*defendant's mind.* Without such testimony, there is usually no direct evidence of involuntariness.

(Emphasis supplied).

## F. "Silence is often evidence of the most persuasive character." ... Justice Brandeis

 We now turn from the mere absence of any testimony as to involuntariness to the appellant's silence as possible affirmative evidence of voluntariness. It is, of course, a truism that a criminal defendant enjoys the privilege, under both state and federal constitutional law, of not being compelled to be a witness against himself. It follows that adverse comment may not be made on the failure of a defendant to testify at his trial on the merits of guilt or innocence, because of the chilling effect that such adverse comment might have on the exercise of the privilege. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

 Where, on the other hand, for some reason such as double jeopardy, the running of limitations, or a grant of immunity, there is no risk of incrimination there is no privilege and consequently no shield against adverse comment. At a preliminary hearing on the admissibility of such things as a confession, an identification, or physical evidence, a defendant's testimony is protected by full use immunity, guaranteeing that nothing he says may be used against him at the trial on the merits. *Simmons v. United States,* 390 U.S. 377, 392–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The appellant here, therefore, was free to testify at the suppression hearing without any risk of incrimination. He chose not to do so.

Under the circumstances, we, in making our *de novo* determination about the voluntariness of the appellant's responses on October 3, are not inhibited from taking into account his pregnant silence about his state of mind. Voluntariness concerns his personal subjective reactions to external stimuli. He was free to take the stand and tell Judge Spellbring of his innermost thought processes without any risk of incrimination. His failure to do so may be given, in this case by us, that

common sense significance that silence frequently evidences in everyday life.

■ Throughout the suppression hearing, the appellant was present at the trial table. Representing him, advising him, and at his side was trained legal counsel. The appellant was free to testify about any of the circumstances surrounding his interrogation, without any risk that his testimony could later be used by the State at trial on the merits of guilt or innocence. Under the circumstances, the deliberate failure of the appellant to counter the testimony of the two officers that the appellant's responses to interrogation were voluntary strongly suggests the conclusion that there was no counter-vailing reality. As the Supreme Court noted in *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975):

> Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute the untrue accusation.

In *Baxter v. Palmigiano*, 425 U.S. 308, 319, 96 S.Ct. 1551, 47 L.Ed.2d 810, 822 (1976), Palmigiano was an inmate of the Rhode Island Adult Correctional Institution charged, in a prison disciplinary proceeding, with "inciting a disturbance and disrupting [prison] operations, which might have resulted in a riot." 425 U.S. at 312, 96 S.Ct. 1551. At his hearing before the disciplinary board,

> *Palmigiano was advised that* he was not required to testify at his disciplinary hearing and that he could remain silent but that *his silence could be used against him.*

425 U.S. at 316, 96 S.Ct. 1551 (emphasis supplied).

The United States Court of Appeals for the First Circuit held that the drawing of an adverse inference from the inmate's silence was a violation of his Fifth Amendment privilege against compelled self-incrimination, 510 F.2d 534 (1974), but the Supreme Court reversed that decision.

> The Court of Appeals for the First Circuit held that the self-incrimination privilege of the Fifth Amendment, made applicable to the States by reason of the Fourteenth Amendment, forbids drawing adverse inferences against an

inmate from his failure to testify. *The State challenges this determination, and we sustain the challenge.*

425 U.S. at 316, 96 S.Ct. 1551 (emphasis supplied).

The Prison Disciplinary Board, in finding that Palmigiano was guilty of breaking the rules, used his silence against him as one (but not the sole) circumstance pointing to his guilt.

At the hearing, Captain Baxter read the charge to Palmigiano and summarized the two reports. *In the face of the reports, which he had seen, Palmigiano elected to remain silent. The Disciplinary Board's decision was based on* these two reports, *Palmigiano's decision at the hearing not to speak to them,* and supplementary reports made by the officials filing the initial reports.

425 U.S. at 320 n. 4, 96 S.Ct. 1551 (emphasis supplied). The Court found no error in the drawing of an adverse inference from the inmate's silence.

The short of it is that permitting an adverse inference to be drawn from an inmate's silence at his disciplinary proceedings is not, on its face, an invalid practice; and there is no basis in the record for invalidating it as here applied to Palmigiano.

425 U.S. at 320, 96 S.Ct. 1551.

Justice White reminded us that the prohibition against adverse comment, rooted in the Fifth Amendment privilege, actually derogates from, rather than enhances, the truth-seeking function.

*It* has little to do with a fair trial and *derogates rather than improves the chances for accurate decisions.* Thus, aside from the privilege against compelled self-incrimination, *the Court has consistently recognized that in proper circumstances* silence in the face of accusation is a relevant fact not barred from evidence *by the Due Process Clause.*

425 U.S. at 319, 96 S.Ct. 1551 (emphasis supplied).

The key to the result in *Baxter v. Palmigiano* is that there was no risk of incrimination because a prison disciplinary hearing is not a criminal case and the imposing of punishment for a disciplinary breach is not a conviction for crime.

Disciplinary proceedings in state prisons, however, involve the correctional process and important state interests other than conviction for crime.

425 U.S. at 319, 96 S.Ct. 1551.

Even in a criminal case, the removal of the risk of incrimination by, for instance, an appropriate grant of use immunity removes the Fifth Amendment shield from the evidentiary use of silence.

> Had the State desired Palmigiano's testimony over his Fifth Amendment objection, we can but assume that it would have extended whatever use immunity is required by the Federal Constitution. *Had this occurred and had Palmigiano nevertheless refused to answer, it surely would not have violated the Fifth Amendment to draw whatever inference from his silence that the circumstances warranted.*

425 U.S. at 318, 96 S.Ct. 1551 (emphasis supplied). The appellant in this case, of course, enjoyed such use immunity for any testimony he chose to give at the suppression hearing on the issue of voluntariness.

Justice White pointed out, 425 U.S. at 318, 96 S.Ct. 1551, that the evidentiary significance of silence has traditionally been recognized in civil cases.

> Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*"

In *Baxter v. Palmigiano,* the choice to remain silent had similar evidentiary significance.

> The advice given inmates by the decision-makers is merely *a realistic reflection of the evidentiary significance of the choice to remain silent.*

425 U.S. at 318, 96 S.Ct. 1551 (emphasis supplied).

To a similar effect, Justice Louis Brandeis spoke for a unanimous Court in *United States ex rel. Bilokumsky v. Tod,*

263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923). Because a deportation hearing was not a criminal trial and because nothing the defendant had to say could literally incriminate him, his silence on a critical issue was evidence that could be turned against him on that issue.

> *Silence is often evidence of the most persuasive character. Bilokumsky was present at the hearing, personally and by counsel. He, presumably, knew whether or not he was a citizen.* Since alienage is not an element of the crime of sedition, *testifying concerning his status could not have had a tendency to incriminate him. There was strong reason why he should have asserted citizenship, if there was any basis in fact for such a contention. Under these circumstances his failure to claim that he was a citizen and his refusal to testify on this subject had a tendency to prove that he was an alien.*

> *[T]here is no rule of law which prohibits officers* charged with the administration of the immigration law *from drawing an inference from the silence of one who is called upon to speak. There is no provision which forbids drawing an adverse inference from the fact of standing mute.* To defeat deportation *it is not always enough* for the person arrested *to stand mute at the hearing and put the Government upon its proof.*

263 U.S. at 153–55, 44 S.Ct. 54 (emphasis supplied).

■ On the issue of voluntariness, a defendant's subjective state of mind is, after all, the ultimate issue. It is the defendant who knows that state of mind better than anyone else. The defendant who fails to testify as to his state of mind, when he could readily do so without any risk of incriminating himself, self-evidently thereby weakens his position. He asks the courts to speculate in his favor, but he declines to give them the testimonial assistance that only he could give. Such a course of conduct realistically invites an inference in the opposite direction.

### G. October 3 Was Essentially a Replay of August 27

The voluntariness of what the appellant told Sergeant De-loatch on August 27 in Texas is not in issue and that voluntariness may now be taken as a given. What the appellant told Sergeant Deloatch in Maryland on October 3 was virtually a word-for-word replay of what he had earlier told him in Texas on August 27. If anything was the likely stimulus for the appellant's October 3 performance, therefore, it was almost unquestionably the desire to remain consistent with his earlier August 27 performance.

Under the "cat out of the bag" theory, if the August 27 responses had been involuntary, the repetition of those responses on October 3 might arguably be deemed the tainted "fruit of the poisonous tree." *United States v. Bayer,* 331 U.S. 532, 540–41, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). If, on the other hand, the August 27 responses were untainted, a repeat performance consistent with the earlier performance would be nothing more than the "fruit of an unpoisoned tree," and that is not the stuff of which involuntariness is made.

### H. The Appellant Never Really Cracked

On October 3, the appellant may arguably have momentarily wavered emotionally but he ultimately did not crack in terms of admitting his guilt. Accepting this as an ambiguous event, subject to conflicting interpretations, we, of course, are enjoined at this level of review to look at events (to wit, to resolve ambiguities) in the light most favorable to the State. *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003). In that light, the State, however much it may have wished to, was unable to break the appellant's will to resist.

Even under emotional stress, the appellant maintained his innocence, as the cross-examination of Sergeant Deloatch by defense counsel revealed:

Q He was tearful, not sobbing?

A Not sobbing, yes.

Q But he had tears in his eyes?

A Yes.

Q In response to your questioning he told you that he had messed up his life?

A Yes.

Q And then you still tried to get a statement from him; didn't you?

A Yes, I did.

Q And that's when he said you have Joe Joe's statement?

A Yes.

Q *And he said he wasn't going to give you a statement, correct?*

A *That's correct.*

Q *And he continued to deny his involvement in the shooting, correct?*

A *Yes.*

Q He told you he had nothing more to say?

A He didn't say he had nothing more to say. He just kept denying it, his involvement.

Q *And he said I have nothing to say.*

A *That's what he said, okay.*

(Emphasis supplied).

In the light most favorable to the State, that adamancy argues against involuntariness. In a multi-factored analysis, the fact that the appellant never confessed to murder is a factor. We are not suggesting that even a grudging and ambiguous compromising wince could not be involuntary. What we are suggesting, as we assess the relative weight to be given to factors pointing in either direction, is that on the voluntariness-involuntariness continuum, the strongest evidence of involuntariness is a final "cave in," wherein a suspect fully and unequivocally confesses his guilt. In this case, of course, there is nothing approaching such an unconditional surrender.

## I. The Voluntariness of the *Miranda* Waiver

The appellant conceded that both on August 27 and on October 3 the federal constitutional standards under *Miranda v. Arizona* were fully complied with. *Miranda* was both applicable and satisfied. That satisfaction included the voluntariness of the appellant's waiver of his *Miranda* rights.

Although the voluntariness of a *Miranda* waiver and the voluntariness of a statement under Maryland common law are not necessarily identical, there is nonetheless a massive overlapping of those respective analyses. Even though the voluntariness of the *Miranda* waiver in this case is not *ipso facto* dispositive of the voluntariness issue now before us, it is, at the very least, a significant factor bearing on voluntariness, as indeed a finding of *Miranda* involuntariness would be a factor in the other direction. As we observed in *Ashford v. State,* 147 Md.App. 1, 55, 807 A.2d 732 (2002):

> For essentially the same reasons that we affirmed Judge Spellbring's ruling that the appellant's waiver of his *Miranda* rights was voluntary, we also affirm Judge Spellbring's ruling that the ensuing statement itself was voluntary. *There is almost a Newtonian principle at work that the voluntariness that validated the Miranda waiver continued unabated through the immediately ensuing statement.*

(Emphasis supplied).

## J. Our *De Novo* Determination of Voluntariness, If Appropriate

Because voluntariness according to the common law of Maryland is not necessarily a constitutional fact, it is by no means a foregone conclusion that appellate courts are entitled to make their own independent *de novo* determination as to it as opposed to reviewing the suppression hearing judge's fact-finding on that issue for clear error.[3]

---

**3.** If, as seems to be a dangerous current trend, every final determination at a suppression hearing becomes a subject for independent *de novo* appellate determination, the suppression hearing determination, to which we have been traditionally deferential, will be reduced to little

If our proper appellate posture is one of fact-finding deference, we hold that Judge Spellbring was not clearly erroneous in finding that the appellant's responses to interrogation were voluntary.

If, on the other hand, our appellate responsibility is to make an independent *de novo* determination as to voluntariness, we, deferring to Judge Spellbring's findings of constituent facts as not clearly erroneous and in viewing all other circumstances beyond his specific fact-finding in the light most favorable to the State, find that the appellant's responses to the police interrogation of October 3 were voluntary, as voluntariness has been defined according to the common law of Maryland.

## The Non–Preservation Of an Alleged Discovery Violation

The appellant's third contention is that Judge Spellbring erroneously failed to provide adequate relief for an alleged discovery violation. Although our cursory glance does not indicate that there is any merit to the contention, the shortest answer to it is that it has not been preserved for appellate review.

The key state's witness against the appellant was the friend and companion of the appellant, Kenneth Smith. When Smith was initially contacted by the police, he was a very reluctant and uncooperative witness. The police were skeptical about his initial story to them and subjected him to a voice stress analysis, the result of which showed "deception" on his part. When confronted with evidence of his deception, Smith changed his story to the police and later testified to the altered version of events.

The prosecution properly and timely informed defense counsel that Smith had taken and "failed" the voice stress analysis. Defense counsel requested more detail about the test, however, to help him frame his cross-examination. As the cross-examination was about to begin, defense counsel had still not

more than the preliminary fact-finding of a master in chancery. Where is a principled line to be drawn between independent *de novo* fact-finding and appellate "second guessing"?

received the precise details of the test. The problem was that the State also did not have a copy of the test results. Judge Spellbring ruled that the voice stress analysis "certainly is something that he's entitled to see before he crosses." The only problem was how best to accomplish that end. Judge Spellbring sought to resolve the procedural impasse.

THE COURT: Would your lead detective, whoever that may be, have that information in the case file?

MS. ALVES [PROSECUTOR]: He does not have that information in the case file. I called Detective McClelland who ran the voice stress. He did not have that information. He was looking for that information.

THE COURT: Okay. Let's assume that the police say that the voice stress analysis shows deception, where do we go with it from there?

MR. TRAINOR [DEFENSE COUNSEL]: I would be interested in knowing, they usually say it shows deception on this question or that answer, and that would give me guidance as to how to cross this guy. I hate to just take a shot in the dark.

MS. ALVES: Your Honor, that information is not admissible anyway.

THE COURT: Well, it may not be admissible but *it certainly is something that he's entitled to see before he crosses.*

*Is there any reason why we just can't*—and I'll leave this up to you, Mr. Trainor-*interrupt this testimony at this time, put your other witnesses on today and come back in the morning?*

MS. ALVES: No.

THE COURT: Do you—

MR. TRAINOR: *I would rather keep him on the stand if I could and I tell you what I would like to do. I would like to go as far as I can with him today, be provided that information and have him available if I need him.*

THE COURT: If you choose to.

MR. TRAINOR: *I can put him back on cross.*

THE COURT: *If you choose to.*

MR. TRAINOR: *Right.*

THE COURT: Okay. That's fine.

MS. ALVES: Thank you.

MR. TRAINOR: Thank you.

After the cross-examination was concluded, Judge Spellbring called counsel to the bench for a strategy session.

THE COURT: You want me to keep him under the subpoena power based on whatever decision will be furnished?

MR. TRAINOR: Yes and subject to the rule on witnesses as well.

THE COURT: Mr. Denton, are you going to be available tomorrow, sir?

MR. DENTON [SMITH'S COUNSEL]: I am now, Your Honor.

THE COURT: Would you ask—not ask, would you tell your client he has to come back tomorrow and perhaps keep him some place near your office or some place that he would be available to you. We don't know if we're going to need him or not.

MR. DENTON: Frankly, we had discussed his leaving the area after he testifies as you might imagine. But I will tell you, as you can imagine—but I will tell him to make himself available to my office tomorrow.

At that point, Judge Spellbring had given the appellant all the relief he had requested. Defense counsel indicated that after he reviewed the voice stress analysis test, he would then make his decision as to whether to recall Smith for further cross-examination. Smith remained available for recall. When the trial resumed the next morning, however, there was no further discussion of the voice stress analysis. When asked whether he would be calling, or recalling, any witnesses, defense counsel expressly informed the court that he would not.

Accordingly, Judge Spellbring was not called upon to make any ruling. No objection was made by the appellant to any ruling that was made or to any failure to make a ruling. Even at this late date, the appellant does not indicate precisely what further he wanted Judge Spellbring to do. This contention is clearly nothing more than a case of undifferentiated post-verdict angst. *Gilliam v. State*, 331 Md. 651, 691, 629 A.2d 685 (1993) ("As [the defendant] did not object to the course of action proposed by the prosecution and taken by the court, and apparently indicated his agreement with it, he cannot now be heard to complain that the court's action was wrong."); *Watkins v. State*, 328 Md. 95, 99–100, 613 A.2d 379 (1992) (where a party acquiesces in a court's ruling, there is no basis for appeal from that ruling); *Grandison v. State*, 305 Md. 685, 765, 506 A.2d 580 (1986) ("By dropping the subject and never again raising it, [the defendant] waived his right to appellate review.").

### The Non–Objection To a Helpful Blurt

The appellant's fourth contention similarly does not get off the ground. The contention is that Judge Spellbring "gave no relief" after Kenneth Smith gave an unresponsive and inaccurate blurt about a "lie detector" test.

Kenneth Smith never took a lie detector test. He took a voice stress analysis test. He, however, misperceived his voice stress analysis test as a lie detector test.[4] During an effective cross-examination by defense counsel, Smith conceded that the story he told in court was not the story he first told the police, that the police did not believe his first story, and that the police required him to take a test probing his truthfulness. Only after hearing the results of that test did he change his story.

Q. But they brought you back the next day, correct?

---

4. A voice stress analysis is, of course, a form of lie detector test, in the larger generic sense of that noun phrase. It focuses on a subject's physical reactions as it probes for indications of deception. On the other hand, it is not the traditional polygraph test which the phrase "lie detector test" conjures up in the popular mind.

A. They brought me back the next day?

Q. To the police station?

A. I don't recall that.

Q. So you think you only went to the police station once, correct?

A. Correct. They did take me in another day. It was two days.

Q. They took you back the next day, the day after?

A. Yeah, because they gave me a lie detector test.

Q. They didn't give you a lie detector test, did they?

A. Yes, they did.

At that point the State objected. The appellant never objected. The appellant made no motion to strike the answer. He neither moved for a mistrial nor requested any other relief. The appellant, hot on the trail of impeaching the credibility of the State's key witness, simply insisted that he be allowed to continue and to "ask him now if he was told that he failed whatever test they gave him." Judge Spellbring allowed defense counsel to proceed.

Q. *It was clear to you that the police did not believe you, correct?*

A. *Yes.*

Q. So you changed your story, right?

A. No, I told the truth.

Q. *Which was quite different from what you told before, right?*

A. *Yes.*

Q. *A different story, correct?*

A. *Yes.*

(Emphasis supplied).

What the appellant is now appealing is a mystery. We leave it at that. Maryland Rule 8–131(a).

## Only Convictions Merge; Non–Convictions Do Not Merge

■ The appellant's final contention involves only a bit of housecleaning, but it is nonetheless a point well taken. He complains that he was sentenced, albeit only by way of merger, for a crime for which he had not been convicted. So he was.

The appellant was convicted of two first-degree murders. He received two life sentences. The appellant was necessarily convicted of two subsumed charges of second-degree murder. Those two convictions were merged into the two convictions for first-degree murder. At that point in the sentencing process, Judge Spellbring had fallen into the hypnotic Noah's Ark rhythm of two by two by two.

The appellant was also convicted of a single count of using a handgun in the commission of a crime of violence. He received a sentence of twenty years. Instead of stopping abruptly in mid-melody, Judge Spellbring completed the rhythmic cadence by merging a second conviction for handgun use. There was, however, no second conviction to be merged. Commendably, the State concedes that that ostensible merger of a non-existent conviction must be wiped from the record, even if the melody suffers. *Turner v. State,* 301 Md. 180, 186 n. 3, 482 A.2d 869 (1984).

**MERGER OF A SECOND CONVICTION FOR THE USE OF A HANDGUN IN A CRIME OF VIOLENCE VACATED; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**