857 A.2d 557

**Adele Florence FREEMAN**

v.

**STATE of Maryland.**

**No. 3047, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 8, 2004.

William E. Nolan (Stephen E. Harris, Public Defencer on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr. Attorney General on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., HOLLANDER, CHARLES E. MOYLAN, JR., (Retired, specially assigned) JJ.

HOLLANDER, Judge.

Kevin Gross was shot to death on March 30, 2000, by his girlfriend, Adele Florence Freeman, appellant. A jury in the Circuit Court for Calvert County subsequently convicted Freeman of first degree premeditated murder, as well as first degree assault and use of a firearm in the commission of a felony.[1] Thereafter, Freeman was sentenced to life imprisonment, with all but forty-five years suspended, for the murder conviction, and to a concurrent term of twenty years for the firearm offense. The assault conviction was merged.

On appeal, Freeman claims that "the circuit court err[ed] by failing to suppress the statements [she] made … during custodial interrogation." From appellant's brief, we glean two arguments in support of her claim. First, appellant argues that the court erred in failing to suppress her statements because she had invoked her right to remain silent, and therefore her *Miranda* rights were violated. Second, she claims error based on a delay in her presentment to a commissioner. Rejecting both contentions, we shall affirm.

## I. FACTUAL SUMMARY—SUPPRESSION MOTION[2]

 Appellant moved to suppress various statements that she gave to the police during her interrogation on the evening

---

1. Appellant, who has a history of bipolar disorder, claimed that, at the time of the killing, she suffered from paranoid schizophrenia. At a hearing held after the trial, the court found appellant criminally responsible.

2. In view of the single question posed by appellant, we need not include a summary of the evidence adduced at the trial held in January 2002.

of March 30, 2000. What follows is a summary of the evidence adduced at the suppression hearing in November 2001.[3]

Sergeant Albert Paton [4] of the Maryland State Police testified that he was the shift supervisor at the Prince Frederick Barrack on the evening of March 30, 2000. At about 8:00 p.m., appellant entered the barracks and announced: "I just shot someone." He recalled that a short time earlier, the police "had received a call for a shooting . . . at 1255 Wilson Road. And . . . that a female suspect had been involved in the shooting, that she had shot a black male subject, and that she had left the scene in a white Oldsmobile headed towards the Prince Frederick area."

Paton claimed that "before [he] could reply" to appellant's announcement that she shot someone, "she said I have the gun, it's here in my purse." Paton continued:

> And as she is saying that she started to try to open the purse, and I told her just wait, I will get that from you, just as quickly as I could try to think of a way to approach her, you know, and maintain my safety. So I asked her to have a seat over by the door that comes into the barrack.

3. Our review of the trial court's ruling with respect to a suppression motion is based solely on the record of the suppression hearing. *Dashiell v. State*, 374 Md. 85, 93, 821 A.2d 372 (2003); *see State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000). We review the evidence in the light most favorable to the State as the prevailing party. *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612 (2001); *Charity v. State*, 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000). Moreover, we give due regard to the motion judge's opportunity to assess the credibility of the witnesses. *McMillian v. State*, 325 Md. 272, 281–82, 600 A.2d 430 (1992); *State v. Fernon*, 133 Md.App. 41, 43–44, 754 A.2d 463 (2000). However, we make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Dashiell*, 374 Md. at 93–94, 821 A.2d 372.

4. In her brief, appellant uses the spelling of "Patton." We shall use the spelling of "Paton," which appears in the transcript and other documents in the record, unless we are quoting material that uses the spelling of "Patton."

Paton then took appellant's purse and brought her into the "Trooper's Room where we put persons that are under arrest." At that time, Paton asked appellant which hand she used to shoot the victim, because he wanted to secure that hand in order to perform a gunshot residue test. After appellant responded that she had used her "left" hand, Paton handcuffed that hand to the bench.

Thereafter, Paton advised appellant of her *"Miranda* rights,"[5] reading "word for word" from a "card" provided to him by the State Police. The card was admitted into evidence. Appellant indicated that she understood her rights. However, when Paton asked appellant if she would "knowingly waive these rights," appellant "didn't say anything."

Paton then "retrieved the gun from [appellant's] purse . . . to make sure it didn't have any ammunition in it." He "examined" the weapon and noted "that all the shell casings that [he] could see were empty." Paton testified:

So in order so [sic] that I didn't have to keep handling it, I asked her how many shots she fired, and she said I don't remember. And then I asked her, well, did you fire all the bullets that were in the gun, and she said I don't know, it happened so fast.

Thereafter, Paton "opened the chambers just to see if there was any live ammunition in there." After Paton determined that no live ammunition was in the gun, he "left everything the way it was, closed it back up, and secured the gun." Paton then asked appellant "what happened tonight, and her reply was 'I don't want to talk about it right now.'" Accordingly, Paton "didn't ask [Freeman] anything else." He "got [appellant] a cup of water and just kept an eye on her, that was it." Paton described appellant's demeanor as "normal" and "calm."

On cross-examination, Paton testified that he sat at the front desk and greeted people who came in to the barracks. When appellant "first waled in the door," before she an-

---

5. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

nounced what she had done, he had no reason to believe she had committed the shooting. Paton also explained that, after he handcuffed appellant to the bench, he only questioned her "about the ammunition so that [he] could make the gun safe. [He] wasn't . . . investigating the case."

The following colloquy on redirect is pertinent:

[PROSECUTOR]: When Ms. Freeman walked in and told you she just shot someone, immediately in your mind what did you think based upon the information you had from dispatch?

[PATON]: That this was the woman that was at Wilson Road that had just shot this man.

[PROSECUTOR]: And so based upon that information and the fact that she told you she had a gun, you placed her under arrest?

[PATON]: Yes.

[PROSECUTOR]: When you were speaking with Ms. Freeman did you feel it was necessary to go over with her again the date, place, and nature of the event that she just turned herself in for?

[PATON]: No, ma'am.

[PROSECUTOR]: And when she asked—when she mentioned—when she said to you that she didn't want to talk about it right now, you scrupulously honored that request, did you not?

[PATON]: Yes, I did.

Corporal David Ruel was assigned to investigate the homicide. His "first contact" with appellant occurred in the Troopers' Room at "about 9:35, 9:45, somewhere in that area." At the time, Freeman was "seated on the prison bench handcuffed to the bench."

At the outset, Ruel asked Paton "to step out" of the room and "brief[] [him] on what had gone on up to that point. . . ." Paton advised him that appellant did not want to talk. Ruel asked Ms. Freeman "if she wanted anything to eat or drink or if she needed anything, and she advised she wasn't hungry at

the time, but she did need some medication" for blood pressure. Ruel instructed Corporal Delmar Smith to retrieve the medication. While Smith was gone, appellant remained in the Troopers' Room, and Ruel "would periodically just peek in to make sure that everything was okay in there and just let [appellant] sit for a while."

Appellant's medication arrived at about 10:20 p.m. At that time, Ruel asked appellant, who was still in the Troopers' Room, "if she needed the medication; she again said no." Ruel also "asked [appellant] if she wanted something to eat, and that time she said yes, she wanted something from McDonald's." So, Ruel "got her some food." When the food arrived at about 10:52 p.m., Ruel removed the handcuff so that appellant could eat. However, Ruel recalled that, "prior to ... eating" at about 10:55 p.m., he "read" appellant her *Miranda* rights from the form, and then they "sat down to eat, and ... just talked about her family, what her job was, what her aspirations were...." Ruel explained:

> I read the form in its entirety. Then after completing the last paragraph here, last sentence asking her if she is willing to talk, I have her sign the statement that [sic] where it said signature for her, and then I have her review it again just to make sure that she understands and place her initials by one, two, three, four, and five, each of her rights if she understands them.

According to Ruel, during his advisement appellant did not request a lawyer, nor did she have any questions. Moreover, her demeanor was "very calm and cooperative." Appellant, who was then forty-seven years old, had no difficulty understanding what Ruel said. Although Ruel did not ascertain appellant's educational level, he found her "very articulate", and he "figured she had at least graduated high school," because she "had mentioned earlier in [their] conversation that she had planned on going to college."

Appellant agreed to waive her rights, initialed each question in the waiver form, and signed it. Ruel denied threatening appellant or promising her anything to induce her to do so.

Before appellant provided a statement, she told Ruel that she was diagnosed as "bipolar." After Freeman ate, she made an oral statement to Ruel, which he recounted:

> After finishing her dinner Ms. Freeman went on to advise that earlier that evening she had spoken with Mr. Gross on the phone for a few minutes. During the phone conversation they never argued. She just asked him if she could stop by, and he replied yes. A little later that same evening she drove herself over to Gross's house. At approximately 1930 hours she pulled into and parked in the Gross's driveway and never got out of her car.
>
> Gross then came out of the house and sat in the passenger side front seat. The two sat in the car talking for a while about the upcoming weekend. Freeman advised she was kind of upset because Gross wouldn't take her out to dinner or the movies this Saturday. She then confronted him about the past few weekends that he hadn't taken her out and how he went to that dinner thing without asking her if she wanted to go.
>
> Gross then told her he couldn't take her out this Saturday because he had to change the oil in his car. Ms. Freeman then confronted him again, advising him that it wouldn't take him all day to change the oil in his car. He then advised her he also had to tune his car up, but he would try to start working on his car a little earlier. Freeman then advised knowing that a tune-up and an oil change weren't the same thing she got upset and pulled her gun out from under the driver's side seat.
>
> She then got out of the car through the driver's side door and with the gun in her left hand she pointed it at Gross and shot him. Gross then climbed out of the front passenger side door and fell to the ground. Freeman then got back in the car as Gross laid on the ground and shot him two more times. She then put the gun on the front passenger seat, closed the passenger side door, and drove to the barracks. When she arrived at the barracks she put the gun in her purse, walked into the . . . lobby, and told them what she had done.

I then asked Freeman where she got the gun and why she had it, or why she had it with her that night. She advised that she bought the gun from somewhere in Wayson's Corner a while ago, but she couldn't recall the exact date. Freeman further advised that she normally keeps the gun under her front seat of her car for protection when she drives at night. I asked Freeman if she knew it was against the law to keep the gun in her car unless she had a permit to carry it. She advised that she knew this and that she had been meaning to apply for a permit, but she hadn't had the time.

\* \* \*

I then asked Freeman to explain to me what caused this to happen so I could better understand why she did it. She advised me that it was hard for her to remember what happened because it all happened so fast, and she doesn't know why she did it. I then asked her if Gross had hit her or called her any kind of name that may have provoked her, and she advised, no, Kevin was a very nice—Kevin was very nice and never hit me.

I then asked Freeman about the statement witness Charles Gross [6] advised he had heard. She advised that she doesn't remember saying that. I then confronted Freeman with the possibility that Gross was cheating on her, and again she advised, no, Kevin was very nice.... [T]hat's basically all she advised at that point.

Upon completion of her oral statement, Ruel asked appellant if she would provide a written or taped statement. Freeman declined to do so and requested a lawyer. Therefore, Ruel "ended [his] questioning and re-secured [appellant] to the prisoner bench." Ruel denied that any questioning occurred after Freeman requested an attorney. According to

---

6. Charles Gross, Kevin Gross's brother, was a witness at trial. On January 14, 2002, he testified that he heard appellant say: "[Y]ou bastard, you, you don't have to worry about doing this to anybody else."

Ruel, "the whole conversation was about an hour, hour and ten minutes."

Although appellant completed her oral statement at around midnight, she was not taken before a Commissioner until about eight o'clock the next morning. During that time, however, appellant was not questioned. Ruel was questioned generally about the delay. The following colloquy is pertinent:

[PROSECUTOR]: And did there come a time that the [appellant] was taken before a Commissioner?

[RUEL]: Yes.

[PROSECUTOR]: And when was that?

[RUEL]: That was about eight o'clock the next morning.

[PROSECUTOR]: Why was there a brief delay in there?

[RUEL]: Basically for the completion of paperwork, the processing of the actual fingerprint, photograph, and also the Commissioner wasn't coming in until the following morning.

Defense counsel asked Ruel: "Where is the Commissioner's Office in location to the barracks where the interview was conducted?" Ruel responded that the Commissioner's Office is situated 200 to 300 yards behind the barrack. Although Ruel conceded that the Commissioner is "basically on call 24 hours a day," and "could have been available all hours of the night, I just had to call him out," he claimed that "at the time the paperwork wasn't completed, so it would have been pointless to call the Commissioner out."

In argument, appellant's counsel addressed the matter of the advisement and waiver of rights, stating, in part:

After her *Miranda* rights were read ... Sergeant Paton did not receive a response to question seven, which is do you waive these rights. At that point it's the defense's contention that she was clearly invoking her right to remain silent. She hadn't waived any of her rights. Yet Sergeant Paton continued to make inquisitions of her as to how many shots were fired, did you fire all the bullets, things of that nature,

to which Ms. Freeman responded. I think those, although her rights had been read to her, she had not clearly and voluntarily, freely and voluntarily and knowingly waived her rights because there was no response to Sergeant Paton's last question on his card list that he had read to Ms. Freeman. So I think those clearly should be suppressed.

At the end of her discussions with Sergeant Paton what she clearly indicated is that I do not want to talk about it right now. Yet knowing that, Trooper Ruel goes back two hours later, begins to re-Mirandize her and begins to question her. She has made no attempt at that point to re-initiate questioning. She has made no indication to the officers that she wants to talk about the case. They have gotten her food and other things, but she had made no initiation to give up her right to remain silent, which she had indicated twice by my analysis of the case.

First of all when she indicated that she did not knowingly waive her rights to Sergeant Paton she was invoking her right to remain silent. And clearly she said I don't want to talk about it right now, which means she is invoking her right to remain silent. Both those times she is making it clear to officers . . . that she did not want to speak to them about this case at all. Yet Trooper Ruel went ahead and initiated contact and re-advised her of her rights, and at that point in time took what I believe to be an illegal statement from Ms. Freeman.

With respect to the issue of delay in presentment, defense counsel argued:

[I]f you look at the fact that they violated her right to remain silent, you also have to look at the fact that they delayed in presenting her to a Commissioner. Trooper Ruel has told the Court that a Commissioner is on call 24 hours a day, seven days a week.

Now, there is clear case law that says that delay for the purposes of obtaining a confession where followed by presentment to the police continuing interrogation must be excluded on the common law principles of voluntariness.

Courts have ruled that delay in presentment to the Commissioner doesn't necessarily exclude the statement per se, which was the rule at one point.

\* \* \*

[D]elay would be reasonable if it was brief, was necessitated by [sic] reasonable request such as unavoidable delays involving transporting, handling, booking, or non-availability of magistrates. We don't have any of that here.... [A]n unreasonable delay for the purposes of gathering additional evidence to justify arrest or motivated by ill-will or delay for delay sake cannot be allowed.

\* \* \*

In this situation in this county it's pretty clear if they had called for a magistrate at ten o'clock when she had already invoked her right to silence, they could have taken her in front of the Commissioner. Waiting until 8:15 the next morning to take her in front of the Commissioner doesn't make any sense. And I think it's a delay just for the purpose of trying to get a statement from her first of all, or to gather additional evidence. Because if they get in front of a Commissioner without that statement, obviously think [sic] may have enough to hold her for probable cause purposes, but the statement makes it a much cleaner case.

The State responded that silence alone does not amount to the invocation of one's rights under *Miranda*. The State also claimed that the statement, "I don't want to talk about it right *now*," did not mean "I don't want to talk to you *ever*." Moreover, the prosecutor argued that, "in the context of custodial interrogation the police can re-initiate questioning regarding the same subject matter after an invocation of the right to silence if they first promptly stop questioning her after the invocation, which is what happened here." The prosecutor noted that the officers allowed some time to pass before re-initiating questioning and then re-advised appellant of her *Miranda* rights.

Characterizing as a "blurt" appellant's announcement when she walked into the barrack that she just shot someone, the court denied the motion to suppress that statement. However, the court suppressed appellant's statement that she used her "left hand" to shoot, stating: "I think the State has conceded that the answer to the question about which hand did you use to shoot the gun should be suppressed. The State has agreed with that and I agree with that also."

As to appellant's silence when Paton initially asked her if she would waive her rights, the court said: "I also agree that her mere failure to answer the second question . . . her silence there was not an indication that she wanted a lawyer. It was just simply silence." The court did not comment on whether the silence amounted to an invocation of the right to remain silent.

With regard to appellant's statement to Paton, "I don't want to talk about it right now," the court said:

That is not a statement saying I want to make no further statements, I want to see my lawyer, I don't want to say anything. That's totally different than that, and I don't think any further statements need to be initiated by the defendant.

* * *

Then we have Corporal Ruel speaking to her. He gave her her rights. Those have been shown as State's Exhibit 3. He testified that he read them to her. She signed the form. Then he had her initial everything. His testimony is clear that he thought that she was competent, that she was able to make statements. I don't think it was—when she said she needed her medication for high blood pressure, I don't think it was his burden to make further inquires when he found out there was other medication. Just because she is bipolar doesn't necessarily mean she is not capable of answering those questions at that time.

Looking at all the factors, she is a mature woman, she is age 47, yes, she has no prior criminal record, but she is also

not a youngster that can be intimidated or forced into making statements. The court finds that she—that the State's questioning of her, those answers were totally voluntary. It was after she had completed the statement when she was asked if it could be tape recorded or written that she declined to make any further statement and invoked her right to have an attorney.

With regard to the delay in presentment, the court said:

I don't think the amount of time is unreasonable. Obviously the paperwork needs to be processed. There was an eight o'clock, approximately eight o'clock discussion with the desk sergeant. Then about an hour and a half later Corporal Ruel went in to talk to her, talked about her medicine. When the medicine came he went back in to speak to her. Then he offered her some food, got some food. She was unhandcuffed, allowed to eat dinner. It was during that period of time that these discussions were taking place and she made the statements.

So under the totality of the circumstances here I don't find there is any reason to suppress the evidence. I think that the statements made were totally voluntarily and freely made after having been advised of her Constitutional rights.

We shall include additional facts in our discussion.

## II. Discussion

### A. The Right to Remain Silent

 At trial, Paton testified that he advised appellant of her rights, and she did not have any questions. In Paton's direct testimony, he did not refer to his inquiry to appellant about whether she was willing to waive her rights, or her silence in response to the inquiry.[7] However, he stated that, after his advisement, he asked appellant, "what happened tonight. . . ."

---

7. It was defense counsel, on cross-examination, who elicited from Paton that appellant "remained silent" after the advisement. In closing argument, defense counsel also referred to appellant's silence to support her argument as to the involuntariness of appellant's statements.

Over defense objection, Paton testified as to appellant's reply: "I don't want to talk about it right now." [8]

Appellant contends that the suppression court erred in finding that she did not invoke her Fifth Amendment privilege by remaining mute when Paton asked her if she was willing to waive her rights. Moreover, she insists that, because her silence was an invocation of her right to remain silent, "all questioning was required to cease." Consequently, Freeman asserts that her statement, "I don't want to talk about it right now," (which she designates as statement four), and her oral confession to Ruel (which she designates as statement five), were "erroneously admitted at trial in violation of *Miranda*," because both were obtained after she invoked her right to silence.

With regard to appellant's silence, the State maintains that appellant's "mere failure to answer a waiver question" did not constitute an invocation of the right to remain silent. Indeed, the State contends that it was apparent from the context that Freeman did not invoke her right to remain silent: she voluntarily "came to the police station to turn herself in and announced that she had shot someone, thereby plainly indicating to the police her willingness to accept responsibility for the crime."

The State argues that, at best, appellant's silence was an ambiguous invocation. Therefore, it urges us to apply the rationale of *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). *Davis* requires an unambiguous invocation of the right to counsel, so that police officers do not have "to make difficult judgment calls about whether the suspect in fact wants a lawyer...." *Id.* at 461, 114 S.Ct. 2350.

The State also insists that appellant's silence in regard to the waiver inquiry cannot "be divorced from her subsequent statement that she did not want to talk about the shooting

---

**8.** In a footnote in its brief, the State points out that, "apart from her suppression claim," appellant does not contest "the circumstances of the *Miranda* advisement." Nor does she argue that "her assertion of her right should not have been placed before the jury."

'right now.'" In effect, the State disputes appellant's characterization of statement four as a statement. It claims that statement four "should not even be considered a 'statement' for purposes of *Miranda;* rather, it is itself an assertion of the right to silence." That assertion, says the State, "simply made clear that [appellant] did not waive her right to silence ...," and thus statement four "should not be deemed a 'statement' subject to suppression under *Miranda.*"[9] The State adds:

> Because Freeman's comment, which she designates as "statement 4," is fairly understood in conjunction with her earlier silence as an assertion of her Fifth Amendment right to silence, there is no need for this Court to address whether her mere silence, without more, would constitute an invocation of the right.

With regard to the confession to Ruel, the State maintains that the police "scrupulously honored" the invocation expressed in statement four, "I don't want to talk about it right now." Therefore, the State contends that the court properly admitted appellant's confession to Ruel.

For clarity in our discussion, we summarize, in chronological order, the various custodial statements and conduct identified by appellant, along with the court's rulings:

> *Statement No. 1:* "I just shot someone." The court ruled that it constituted a "blurt" and was therefore admissible. It was introduced in evidence through the testimony of Paton. Appellant does not contest this ruling.

> *Statement No. 2:* Before appellant was advised of her rights, she was asked which hand she used to shoot the victim. She responded, "left." The State conceded that this statement violated *Miranda,* and the court ruled that the statement was inadmissible. Therefore, it is not in issue.

---

**9.** The State has not cited any case that supports its contention that we should analyze the silence and statement four together, as if they were one response.

*Conduct:* Paton advised appellant of her rights, and then asked her whether she would waive her rights. Appellant remained silent. The court ruled that the silence was not an invocation of the right to counsel, and appellant contests the court's finding.

*Statement(s) No. 3:* Paton asked appellant how many shots she fired, and she responded, "I don't remember." Paton then asked her, "Did you fire all the bullets that were in the gun?" Appellant replied, "I don't know, it happened so fast." These statements were not introduced at trial, and thus are not in issue.

*Statement No. 4:* Paton checked the gun and then asked, "What happened tonight?" Appellant responded, "I don't want to talk about it right now." The court ruled that this statement, made to Paton after appellant had been advised of her rights, was neither an invocation of the right to silence nor an invocation of the right to counsel. The court denied appellant's challenge to the statement, and the State introduced it at trial through the testimony of Sergeant Paton. Appellant challenges the admission of the statement.

*Statement No. 5:* A few hours after appellant said, "I don't want to talk about it right now," Corporel Ruel re-advised appellant of her rights, and appellant gave an oral statement, recounting the events of March 30, 2000. The court denied appellant's motion to suppress this statement, and it was introduced at trial through the testimony of Corporal Ruel. Appellant disputes the court's ruling.

Unlike the State, appellant focuses separately on her initial silence in response to Paton's waiver inquiry, claiming that, standing alone, it constituted an invocation of her *Miranda* rights. As the Supreme Court has observed, "[s]ilence in the wake of [*Miranda* ] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous...." *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *see United States v. Hale,* 422 U.S. 171, 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).

As we observed, the State relies on *Davis*, 512 U.S. 452, 114 S.Ct. 2350, to support its contention that appellant's silence was so ambiguous that the police were not required to regard it as an invocation of the right to remain silent. In the State's view, the *Davis* "requirement" for an unequivocal assertion of the right to counsel applies "with equal force to an invocation of the right to silence, where the need for a bright-line rule is equally compelling."

In *Davis*, Naval Investigative Service agents questioned Davis about a murder. *Id.* at 454, 114 S.Ct. 2350. After the agents advised Davis of his rights under military law, Davis agreed to waive his rights. *Id.* at 454–55, 114 S.Ct. 2350. During the interrogation, Davis said, " 'Maybe I should talk to a lawyer.' " *Id.* at 455, 114 S.Ct. 2350. One of the agents sought to clarify whether Davis was " 'asking for a lawyer or ... just making a comment about a lawyer....' " Davis responded that he was not requesting an attorney. *Id.* About an hour later, however, Davis said, " 'I think I want a lawyer before I say anything else.' " *Id.* At that point, the questioning ended. *Id.*

Davis later moved to suppress his statements, claiming that the interrogators failed to honor his invocation of his right to counsel. The motion was denied, and Davis was convicted of murder. *Id.* On review, the Supreme Court sought to craft "a bright line" rule that could be "applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." *Id.* at 461, 114 S.Ct. 2350. Insisting that the invocation of the right to counsel must be articulated with clarity, the Supreme Court said:

> Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

* * *

Rather, *the suspect must unambiguously request counsel.* As we have observed, "a statement either is such an assertion of the right to counsel or it is not."

*Id.* at 459, 114 S.Ct. 2350 (citations omitted)(Emphasis added).

Although the Supreme Court "declined to adopt a rule requiring officers to ask clarifying questions" when faced with an ambiguous assertion, it suggested that "it will often be good practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney...." *Id.* at 461, 114 S.Ct. 2350. The Supreme Court reasoned: "Clarifying questions help protect the rights of the suspect by insuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement...." *Id.*

Freeman concedes that some jurisdictions "do not recognize silence as an invocation" of the right to remain silent, because of its ambiguity. In those jurisdictions, says appellant, "one's silence must be prefaced with an unequivocal statement that he or she is invoking his or her right to remain silent." However, she maintains that "[t]his line of reasoning" derives erroneously from the view "that the standard set forth for invoking one's right to counsel," articulated in *Davis*, 512 U.S. 452, 114 S.Ct. 2350, "is equally applicable to the invocation of silence." According to appellant, "[t]he United States Supreme Court ... has yet to determine whether the *Davis* invocation of counsel standard is in anyway [sic] appropriate to the invocation of silence." Moreover, she points out that "[a]t least six jurisdictions have ruled that a *Davis*-like standard is inappropriate to invocations of silence." With one exception, we are not persuaded to adopt Freeman's position based on the six foreign cases cited by her to support her claim that a *Davis*-like standard is inappropriate to invocations of silence.[10]

---

**10.** Appellant cites *United States v. Montana*, 958 F.2d 516 (2nd Cir. 1992), but it was decided prior to *Davis.* She also cites *State v. Chew*,

# 424

Nevertheless, we agree with appellant that the *Davis* rationale does not apply to the analysis of appellant's silence, but for reasons not advanced by appellant.

Neither party has discussed whether the rationale of *Davis* applies to an ambiguous invocation made *prior* to a waiver of rights. In our view, in determining whether to apply the rationale of *Davis*, it is significant that appellant's alleged invocation of her right to silence occurred *prior* to a waiver of rights, and before interrogation ensued; unlike in *Davis*, it

150 N.J. 30, 695 A.2d 1301 (1997), which involved an ambiguous invocation of the right to counsel, not the right to silence. The Supreme Court of New Jersey acknowledged that, "in some circumstances," New Jersey law "affords greater protection of the right against self-incrimination than does federal law." *Id.* at 1316. Therefore, it considered "it prudent to continue to apply" its "precedent." *Id.* at 1318.

Similarly, in *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994), cited by appellant, the Supreme Court of Hawaii found error in the admission of the defendant's confession, but it relied on Hawaii's Constitution, *id.* at 523–24, "to afford [its] citizens broader protection ... than that recognized by the *Davis* majority under the United States Constitution...." *Id.* at 523. Nor does the decision of the West Virginia court in *State v. Farley*, 192 W.Va. 247, 452 S.E.2d 50 (1994), support appellant's position. The West Virginia court said, *id.* at 59 (citations omitted):

We believe that under *Davis* insubstantial and trivial doubt, reasonably caused by the defendant's ambiguous statements as to whether he wants the interrogation to end, should be resolved in favor of the police and that under these circumstances further interrogation by the police does not offend the West Virginia Constitution...., [W]e hold that to assert the *Miranda* right to terminate police interrogation, the words or conduct must be explicitly clear that the suspect wishes to terminate all questioning and not merely a desire not to comment on or answer a particular question.

We also regard *State v. Strayhand*, 184 Ariz. 571, 911 P.2d 577 (App.Div.1995), as factually inapposite. There, the court found that the police ignored the defendant's repeated invocation of his right to silence during interrogation. It then assumed, *arguendo*, that the invocation was ambiguous, and declined to apply *Davis*. *Id.* at 592. The court concluded that, under Arizona law, any interrogation had to " 'be for the sole purpose' " of clarification of the defendant's ambiguous assertion. *Id.* (Citation omitted).

Finally, appellant cites *State v. Leyva*, 906 P.2d 894 (Utah App.1995). But, it was reversed in part by *State v. Leyva*, 951 P.2d 738 (Utah 1997). As we shall see, *infra*, the 1997 decision in *Leyva* is helpful to our analysis, but not for the reason advanced by appellant.

was not an ambiguous invocation that occurred *during* an interrogation and *after* a waiver of rights. While there may well be sound reason to apply the logic of *Davis* to the matter of an ambiguous invocation of the right to silence that follows a valid waiver of *Miranda* rights, that logic does not extend to an ambiguous invocation that occurs prior to the initial waiver of rights. We explain.

*Davis* involved an ambiguous invocation of the right to counsel that occurred *during* interrogation, and *after* the defendant had already waived his rights; the validity of Davis's *Miranda* waiver was not in issue. It was in that context, where the suspect had already waived his *Miranda* rights and later arguably sought to change his mind, that the Supreme Court ruled that a defendant must clearly articulate his request for counsel in order to invoke that right. Significantly, the Supreme Court said, 512 U.S. at 461, 114 S.Ct. 2350: "We therefore hold that, *after* a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." (Emphasis added).

The issues of "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred...." *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (per curiam). When a suspect "indicates in any manner" that he or she "wishes to remain silent," *Miranda* requires that "the interrogation must cease." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602. Moreover, there is no prescribed form or set way in which to waive *Miranda* rights. *See North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) ("The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case."). If the State seeks to rely on a waiver of rights, however, it carries "a heavy burden" to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination...." *Id.* at 475, 86 S.Ct. 1602. As the Supreme Court said in *Butler*, 441 U.S. at 373, 99 S.Ct. 1755:

That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.[]

Numerous jurisdictions, both federal and state, have applied the rationale of *Davis* to an ambiguous invocation of the right to silence, and have concluded that, as with an ambiguous invocation of the right to counsel, an equivocal invocation of the right to silence need not be honored by the police. Most of these cases, however, involve a defendant's ineffective attempt to invoke his or her constitutional rights *after* the defendant had previously waived *Miranda* rights. In this case, it is noteworthy that appellant's silence preceded a waiver of rights.

In *Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994), *cert. denied*, 514 U.S. 1086, 115 S.Ct. 1801, 131 L.Ed.2d 727 (1995), for example, the Eleventh Circuit determined that the defendant's alleged invocation of his Fifth Amendment privilege "was insufficiently clear. . . ." *Id.* at 1423. Relying on *Davis*, it then concluded "that the same rule should apply to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel." *Id.* at 1424. It reasoned that the concern that supported creation of a "bright line rule" in *Davis* with respect to the right to counsel "applies with equal force to the invocation of the right to remain silent. . . ." *Id.* Thus, it held "that the *Davis* rule applies to invocations of the right to remain silent . . . ." and said: "If the statement is ambiguous or equivocal . . . the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." *Id.* Significantly, the defendant's vague invocation occurred during interrogation, and *after* he had agreed to waive his rights.

Similarly, in *State v. Williams*, 535 N.W.2d 277 (Minn.1995), the suspect was interrogated *after* he had agreed to waive his rights. Then, during the interrogation, he asserted: "I don't have to take any more of your bullshit." *Id.* at 281. Based on his behavior, the defendant claimed he had invoked his right to remain silent, and complained that the police did not scrupulously honor his invocation because they resumed questioning five minutes later. *Id.* at 282–83. The Supreme Court of Minnesota refused to find an unambiguous invocation of the right to silence based on the "suspect's hostile behavior, standing alone. . . ." *Id.* at 283. Rather, it concluded that the suspect's "language" must "sufficiently articulate the desire to remain silent." *Id.* It said: "[N]othing short of an unambiguous or unequivocal invocation of the right to remain silent will be sufficient to implicate *Miranda's* protections." *Id.* at 285. The Court reasoned: "To hold otherwise would encourage judicial second-guessing of police officers as to the meaning of a suspect's actions." *Id.* at 283. Moreover, relying on *Davis,* the court concluded that if clarifying questions are not required when the right to counsel is ambiguously invoked, "it follows by even greater logic that the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his right to remain silent." *Id.* at 285.

*See also Florida v. Owen,* 696 So.2d 715, 717–18 (Fla.1997) (agreeing "that *Davis* applies as much to requests to terminate interrogation as it does to requests for counsel"; reasoning that because "requests for counsel have been accorded greater judicial deference than requests to terminate interrogation," the rationale of *Davis* "applies when a defendant makes an equivocal assertion of any right under *Miranda*"; and holding that police are not required to clarify an ambiguous invocation of the right to silence), *cert. denied,* 522 U.S. 1002, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997); *People v. Cohen,* 226 A.D.2d 903, 640 N.Y.S.2d 921, 923 (1996) (rejecting argument that, after waiver of rights, defendant invoked his right to silence during interrogation by remaining mute for fifteen minutes; conduct was ambiguous and reasonable officer would

not have understood it as assertion of right to remain silent after responding to questions for 30 minutes), *rev'd on other grounds,* 90 N.Y.2d 632, 665 N.Y.S.2d 30, 687 N.E.2d 1313 (1997); *Dowthitt v. State,* 931 S.W.2d 244, 257 (Tex.Crim.App. 1996) (stating that "officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks"); *Midkiff v. Virginia,* 250 Va. 262, 462 S.E.2d 112, 115–16 (1995) (concluding that suspect's statements during interrogation, expressing "reservations about discussing the case," did not amount to an unequivocal invocation of right to remain silent; therefore, police were not required to cease interrogation); *Vermont v. Bacon,* 163 Vt. 279, 658 A.2d 54, 65 (1995) (holding that the rationale of *Davis* "applies equally" to a defendant who has waived his rights and later "ambiguously invokes the right to remain silent during . . . interrogation"), *cert. denied,* 516 U.S. 837, 116 S.Ct. 117, 133 L.Ed.2d 67 (1995). *But see United States v. Thompson,* 866 F.2d 268, 272 (8th Cir.) (concluding that defendant's pre-waiver statements, "taken as a whole," did not indicate a decision to invoke the right to remain silent; therefore, the "scrupulously honored" test of *Michigan v. Mosley* was not triggered), *cert. denied,* 493 U.S. 828, 110 S.Ct. 94, 107 L.Ed.2d 59 (1989); *Bowen v. Arkansas,* 322 Ark. 483, 911 S.W.2d 555, 565 (1995) (finding that, after advice of rights, defendant's assertion that he wanted to " 'think about' " waiver showed his understanding of "what was at stake," but was not an invocation of the right to silence; right to silence may be waived by implication; relying on *Davis* and stating: "We see no distinction between the right to counsel and the right to remain silent with respect to the manner in which it must be effected."), *cert. denied,* 517 U.S. 1226, 116 S.Ct. 1861, 134 L.Ed.2d 960 (1996).

We are persuaded by the reasoning of the court in *State v. Leyva,* 951 P.2d 738 (Utah 1997), which distinguishes between an ambiguous response to an initial *Miranda* advisement and an equivocal post-waiver invocation. The Supreme Court of Utah declined to apply *Davis* to an ambiguous pre-waiver response, concluding that *Davis* was limited to a post-waiver

ambiguous invocation of rights. *Id.* at 745. According to the Utah court, that scenario is an "entirely separate" issue from an ambiguous pre-waiver invocation. *Id.*

Noting that *Davis* did not "address" or "extend to prewaiver scenarios . . . .", the Utah court said that "*Davis* made clear that its holding applied only to a suspect's attempt to *reinvoke* his *Miranda* rights '*after* a knowing and voluntary waiver' of the same." *Id.* (quoting *Davis*, 512 U.S. at 461, 114 S.Ct. 2350). Therefore, the Utah court concluded that an officer faced with an ambiguous response to an initial advisement of *Miranda* rights, i.e., at the pre-waiver stage, is limited to posing questions designed to clarify the suspect's ambiguous response. *Id.* Accord *State v. Tuttle*, 650 N.W.2d 20, 28 (S.D.2002) (adopting *Leyva* and concluding that "[t]he *Davis* holding obviously applies to instances where suspects attempt to invoke *Miranda* rights after a knowing and voluntary waiver of those rights. *Davis*, in sum, applies to an equivocal postwaiver invocation of rights.").

We agree with the Utah court that a careful reading of *Davis* reveals that the Supreme Court's bright line rule, requiring an unequivocal assertion of the right to counsel, pertains to a situation in which the defendant had previously waived his right and then, during the interrogation, arguably sought to exercise his rights. Based on the foregoing, we decline to apply the rationale of *Davis* to our analysis of appellant's silence, because the silence occurred in a pre-waiver context.

■ Next, we consider whether the court erred in failing to recognize appellant's silence as an invocation. In support of appellant's claim that her silence constituted a separate invocation, from which "no legal penalty can flow," she relies on *Younie v. State*, 272 Md. 233, 322 A.2d 211 (1974), and *Crosby v. State*, 366 Md. 518, 784 A.2d 1102 (2001), *cert. denied*, 535 U.S. 941, 122 S.Ct. 1325, 152 L.Ed.2d 233 (2002).

In *Younie*, the defendant was convicted of armed robbery and murder. During a custodial interrogation, he waived his right to remain silent, in that he agreed to answer "some"

questions about the crimes, but refused to answer all of them. *Id.* at 236–38, 322 A.2d 211. Nevertheless, he signed the bottom of each page of the interrogating officer's handwritten statement of the interview. *Id.* at 235, 322 A.2d 211. At trial, over objection, the court admitted the officer's handwritten record of the interview, in which Younie answered fifteen out of twenty-three questions. *Id.* at 236–38, 322 A.2d 211. During closing argument, the State was allowed to refer to Younie's refusals to respond to all of the questions. *Id.* at 238, 322 A.2d 211.

On appeal, Younie complained that "his silence was a permissible exercise of his [constitutional] privilege", and therefore the court should not have admitted in evidence the record of his refusals to answer. *Id.* The Court of Appeals agreed. It held that evidence that the defendant remained silent "creat[ed] the highly prejudicial inference that his failure to respond was motivated by guilt. . . ." *Id.* In the Court's view, the only reasonable inference to be drawn from the refusals to answer was that Younie elected to exercise his constitutional right to remain silent, but a jury might improperly regard his silence as a tacit admission. *Id.* at 244, 322 A.2d 211. The Court said: "[T]he Constitution . . . expressly permits [a suspect] to remain mute and not have this made known to [the jury]." *Id.* Further, it stated:

> Silence in the context of a custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow, and the State has the heavy burden of demonstrating *by clear and convincing evidence that a failure to respond was not an invocation of this right.*

*Id.* (Emphasis added).

Of significance here, the Court also noted, *id.* at 238 n. 1, 322 A.2d 211:

> Arguably, when Younie indicated he would answer only "some" of the questions, or when he "refused to answer" others or when he said he did not want to talk about the armed robbery homicide, the interrogation should have been

terminated according to *Miranda v. Arizona*, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In a similar situation, the Court of Special Appeals in *Law v. State*, 21 Md.App. 13, 318 A.2d 859 (1974) ruled that the continuing custodial interrogation of the appellant there should have ceased when he said, "I don't want to talk anymore" and "I am not going to say any more until I am treated [for my injuries]." *However, as this point is not urged here, we shall not pass upon it.*

(Emphasis added).

*Younie* underscores the inadmissibility of a defendant's silence. In this case, the State did not introduce evidence of appellant's silence. But, *Younie* also suggests that the State must establish by clear and convincing evidence that the failure to respond was *not* an invocation.

Appellant's reliance on *Crosby*, 366 Md. 518, 784 A.2d 1102, is misplaced. There, the defendant "was *not* silent in responding to a particular question...." Instead, he refused to put into writing that which he had already said. *Id.* at 529, 784 A.2d 1102. The Court considered whether that refusal amounted to an invocation of the privilege against self-incrimination and, if so, whether the testimony concerning such invocation was improperly permitted at trial, and thus "impinged" the defendant's "constitutional right to remain silent." *Id.* at 529–30, 784 A.2d 1102. The Court of Appeals said, *id.* at 529, 784 A.2d 1102:

> The protections bestowed upon citizens by the privilege against self-incrimination do not disappear once the accused initially waives his or her rights. An accused may invoke his or her rights at any time during questioning, or simply refuse to answer any question asked, and this silence cannot be used against him or her. *See Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91, 97 (1976)(stating that "[s]ilence in the wake of [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights"); *Younie v. State*, 272 Md. at 244–45, 322 A.2d at 217 (1974)(stating that "[s]ilence in the context of a

custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow ..." and "we must assume that the petitioner's failure to answer was an invocation of his fifth amendment privilege").

The *Crosby* Court concluded that the defendant did not exercise his right to remain silent by refusing to provide a written statement after he gave an oral statement. Rather, he simply declined " 'to reduce to writing his existing statement and waiver of rights....' " *Id.* at 530, 784 A.2d 1102 (citation omitted). While recognizing that "the right to remain silent 'has always been liberally construed in order to give fullest effect to this immunity ....' ", *id.* at 527 n. 8, 784 A.2d 1102 (citations omitted), the Court declined "to extend *Miranda's* application to an illogical extreme." *Id.* at 530, 784 A.2d 1102. *See also State v. Purvey,* 129 Md.App. 1, 18–19, 740 A.2d 54 (1999) (noting that defendant who declined to reduce his oral statement to writing "did not choose to remain silent; he only refused to reduce to writing his existing statement and waiver of rights"; the Court "refuse[d] to extend under *Miranda* ... a refusal to write out one's statement into a full-fledged assertion of one's right to silence.").

*Grier v. State,* 351 Md. 241, 718 A.2d 211 (1998), is also pertinent. There, the Court said: "Evidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible for any purpose, including impeachment." *Id.* at 258, 718 A.2d 211 (citing *Doyle,* 426 U.S. at 619, 96 S.Ct. 2240). The Court reasoned that usually " 'silence is so ambiguous that it is of little probative force.' " *Grier,* 351 Md. at 252, 718 A.2d 211. The *Grier* Court added: "When a defendant is silent following *Miranda* warnings, he may be acting merely upon his right to remain silent", and "a defendant's silence at that point carries little or no probative value, and a significant potential for prejudice." *Id.* at 258, 718 A.2d 211 (citing *Hale,* 422 U.S. at 180, 95 S.Ct. 2133).

Similarly, in *Dupree v. State,* 352 Md. 314, 722 A.2d 52 (1998), the Court reversed a murder conviction because the

police officer testified, over defense objection, that the defendant, having been advised of his rights, did not provide a statement to the police. *Id.* at 316, 722 A.2d 52. The Court held that evidence of the advisement "lacked the threshold relevancy necessary for admissibility," *id.* at 324, 722 A.2d 52, and "was immaterial to any issue in the trial." *Id.* at 332, 722 A.2d 52. Further, the Court ruled that because the defendant "gave no statement to the police" the jury did not need to know of the *Miranda* warnings "to complete its appointed task." *Id.*

Most recently, in *Kosh v. State*, 382 Md. 218, 854 A.2d 1259 (2004), the Court of Appeals underscored that "[p]ost-arrest silence is inadmissible as substantive evidence of a criminal defendant's guilt, regardless of whether that silence precedes the recitation to the defendant of *Miranda* advisements." *Id.*, at 220, 854 A.2d 1259; *see also* at 232, 854 A.2d 1259 (observing that the privilege against self-incrimination is a "mainstay of the American criminal justice system," and the right does not distinguish between pre-*Miranda* and post-*Miranda* silence . . . ."). *See also Miller v. State*, 231 Md. 215, 218, 189 A.2d 635 (1963) (suspect in custody has the right to remain silent and " 'mere silence should afford no inference whatever of acquiescence' " to accusations) (citation omitted); *Garner v. State*, 142 Md.App. 94, 108, 788 A.2d 219 (stating that "prosecutor should not have been permitted to ask appellant a question that . . . insinuated that he chose to remain silent after he turned himself into the police"), *cert. denied*, 369 Md. 181, 798 A.2d 553 (2002).

The tenor of the foregoing cases leads us to conclude that the court below erred in failing to construe appellant's pre-waiver silence as an invocation of her right to remain silent. Although the police could have sought to clarify whether appellant intended her silence as an invocation of her rights, with questions limited to the effort to clarify, Paton should not have ignored the silence by asking appellant "what happened." It follows that Freeman's response to that inquiry, "I don't want to talk about it right now," was erroneously admitted.

■ Nevertheless, we are satisfied, beyond a reasonable doubt, that, in the context of this case, any error was harmless. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976); *see also Borchardt v. State,* 367 Md. 91, 131, 786 A.2d 631 (2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002); *Hudson v. State,* 152 Md.App. 488, 508–09, 832 A.2d 834, *cert. denied,* 378 Md. 618, 837 A.2d 928 (2003). We explain.

First, the statement, "I don't want to talk about it right now," taken alone or in context, cannot be regarded as a tacit admission of guilt. The undisputed evidence showed that appellant came to the police station of her own accord and immediately announced that she had shot someone. In that light, her subsequent statement (statement four) is "fairly innocuous." *Hudson,* 152 Md.App. at 509, 832 A.2d 834. Indeed, the State certainly did not strengthen its case with the admission of statement four. Therefore, we are amply satisfied that "there is no reasonable possibility" that the admission of [statement four] contributed to the rendition of the guilty verdict. *Dorsey,* 276 Md. at 659, 350 A.2d 665.

Moreover, statement four was itself an invocation by Freeman of her right to remain silent. Yet, it does not necessarily follow that the court erred in admitting appellant's subsequent confession to Ruel. We explain.

■ *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), teaches that, even if a defendant invokes the right to silence, the police are not necessarily forever barred from attempting to question the suspect. Appellant concedes as much. Under certain circumstances, the "police may reinitiate discussion with a suspect who has invoked his or her right to remain silent if a significant period of time has elapsed and if the police have re-advised the suspect of his or her rights." *Raras v. State,* 140 Md.App. 132, 154, 780 A.2d 322 (discussing *Mosley* ), *cert. denied,* 367 Md. 90, 785 A.2d 1292 (2001).

Mosley was arrested in connection with certain robberies. After he was advised of his rights, Mosley invoked his right to

remain silent, and the detective "promptly ceased the interrogation." *Mosley,* 423 U.S. at 97, 96 S.Ct. 321. About two hours later, Mosley was again advised of his *Miranda* warnings by another detective who questioned Mosley about an unrelated murder. *Id.* at 97–98, 96 S.Ct. 321. Mosley did not ask to consult with a lawyer, nor did he "indicate that he did not want to discuss the homicide." *Id.* at 98, 96 S.Ct. 321. During the interrogation, which lasted approximately fifteen minutes, Mosley implicated himself in the homicide, and he was subsequently charged with first degree murder. *Id.*

In his suppression motion, Mosley claimed that, under *Miranda,* "it was constitutionally impermissible" for the police to question him about the murder because he had previously asserted that "he did not want to answer any questions about the robberies." *Id.* at 98–99, 96 S.Ct. 321. The trial court denied the motion, and the statement was introduced at trial. *Id.* at 99, 96 S.Ct. 321. On appeal, the Supreme Court noted, *id.* at 104–05, 96 S.Ct. 321:

> A review of the circumstances leading to Mosley's confession reveals that his "right to cut off questioning" was fully respected in this case. Before his initial interrogation, Mosley was carefully advised that he was under no obligation to answer any questions and could remain silent if he wished. He orally acknowledged that he understood the *Miranda* warnings and then signed a printed notification-of-rights form. When Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's

inquiries. Detective Hill did not resume the interrogation about the White Tower Restaurant robbery or inquire about the Blue Goose Bar robbery, but instead focused exclusively on the Leroy Williams homicide, a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by Detective Cowie. Although it is not clear from the record how much Detective Hill knew about the earlier interrogation, his questioning of Mosley about an unrelated homicide was quite consistent with a reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies.

Recognizing that, under certain circumstances, the police may re-initiate an attempt to interrogate a suspect despite a prior invocation of the right to silence, the *Mosley* Court said, *id.* at 105–06, 96 S.Ct. 321:

> This is not a case ... where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

Nevertheless, the Supreme Court underscored that the admissibility of an accused's statement, made after the invocation of his Fifth Amendment privilege, depends in part on whether the police "scrupulously honored" the accused's right to remain silent. It explained:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ...." [*Miranda*,] 384 U.S., at 479, [; 86 S.Ct. at 1630]. The critical safeguard identified in the passage at issue is a person's "right to cut

off questioning." *Id.,* at 474 [86 S.Ct. at 1627]. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Mosley,* 423 U.S. at 103–04, 96 S.Ct. 321 (footnote omitted). *Compare Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.").

Appellant maintains that *Mosley* is inapplicable here, because "the police did not 'scrupulously honor' appellant's invocation of her right to remain silent." She complains that Paton "continued to question appellant even though she refused to waive her *Miranda* rights by remaining silent." Freeman asserts that the police may reinitiate questioning only if: "(1) the police wait a significant period of time (per *Mosley,* at least two hours); (2) provide the suspect with a fresh set of *Miranda* warnings, and obtain a second *Miranda* waiver; (3) restrict the second interrogation to crimes not discussed prior to the original invocation; and, (4) conduct the interrogation in a different location with different interrogating officers." Appellant adds: "[A]lthough the interrogation was conducted by a different officer, approximately two hours

later, and upon warning appellant a second time of her *Miranda* rights—the interrogation was conducted in the same location and concerned the same subject matter." Further, she contends: "Even if Sgt. Patton had scrupulously honored appellant's invocation of silence, Corporal Ruel did not comply with the holding of *Mosley* by conducting the interrogation in the same location and about the same subject matter." We disagree with appellant's analysis.

*Latimer v. State*, 49 Md.App. 586, 433 A.2d 1234 (1981), establishes that, even if appellant's silence was an invocation, further questioning was not forever barred. After Latimer was arrested, the police advised him of his *Miranda* rights. *Id.* at 587, 433 A.2d 1234. Because Latimer declined to waive his rights, the police did not question him. *Id.* However, when the police later sought a writing sample from Latimer, he was again advised of his rights on this occasion, he agreed to waive his rights and then gave a statement. *Id.* at 588, 433 A.2d 1234. Relying on *Edwards v. Arizona, supra,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, Latimer argued that his statement was inadmissible because he had initially availed himself of the right to remain silent, and he did not make an overture to police. *Id.* This Court opined that *Edwards* was "concerned specifically with a valid waiver of the right to counsel and does not encompass the specific request to remain silent." *Id.* The Court said, *id.:*

> [I]n the situation where the defendant has chosen to remain silent without more, he has not necessarily indicated a belief that he is unable to speak for himself and is in need of an attorney. Instead, he has chosen to remain silent for the present; that choice should not, in our opinion, destroy *all* lines of communication nor make a prelude by the defendant absolutely necessary before further questioning.

Guided by *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, we noted that: "there was an interval of more than two hours" before Latimer was questioned "by another police officer at another location." *Latimer*, 49 Md.App. at 589, 433 A.2d 1234. We said: "Although the questioning that resulted apparently included the same subject matter as was

attempted at the first interrogation, the initial purpose of the second inquiry was for the extraction of handwriting exemplars." *Id.* Moreover, we recognized that *Miranda* "does not create a *per se* proscription of all further interrogation" after the suspect has invoked his right to silence. *Id.* at 590, 433 A.2d 1234.

The Court cited numerous cases for the proposition that, upon an invocation of the right to remain silent, police must cease their interrogation in order to "notify the defendant that all he needs to do to foreclose or halt questioning is to give a negative response when asked if he will submit thereto." *Id.* at 591, 433 A.2d 1234. The Court explained, *id.:*

> In order to communicate this message it is imperative that the interrogation stop for some period of time. By this stoppage the defendant is made aware that he need answer no further questions either then or later unless he so desires. It seems then that the action that is condemned in *Miranda* is police refusal to take a defendant's "no" for an answer, that is, situations wherein the police continue to question and thereby harass and coerce the defendant so as to overcome his asseveration of his constitutional right to remain silent.

The Court found no *Miranda* violation, however. It reasoned: "[W]e do not believe that the defendant's choice to remain silent for the present should destroy all lines of communication. Such a situation could lead only to a stalemate." *Id.*

*Manno v. State,* 96 Md.App. 22, 623 A.2d 677, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993), also provides guidance. Upon arrest for murder, Manno "was advised of his rights but insisted that he 'did not want to talk about it.' " *Id.* at 26, 623 A.2d 677. Later, at the police station, Manno agreed to make a statement. *Id.* After Manno described his activity on the evening of the shooting, "appellant remained silent until asked why he shot [the victim]", at which time he explained that he had gone to see his psychiatrist the morning after the shooting but never actually went inside. *Id.* Manno complained that

his psychiatrist "considered his mental condition to be a joke", and then "declined to answer any more questions without the presence of an attorney." *Id.*

The Court noted that in *Latimer* it had determined "that *Mosley* did not create a *per se* proscription of all further interrogation once the person being interrogated has invoked the desire to remain silent." *Id.* at 41, 623 A.2d 677. Moreover, it recognized that the *Mosley* Court "did not require that questioning cease and only resume when counsel is present once a person has expressed a desire to remain silent." *Id.* at 42, 623 A.2d 677. The *Manno* Court said, *id.* at 42–43, 623 A.2d 677:

> There was clearly evidence before the Circuit Court for Baltimore County that appellant did not indicate he wanted an attorney "until after the interview." Under the Supreme Court's decisions in *Mosley* and *Edwards* and our decision in *Latimer*, by no stretch can appellant's statement that "I don't want to talk about it" be interposed as a requirement that counsel be present before there could be any further interrogation.

Here, Paton testified that, after appellant was non-responsive to his waiver inquiry, he secured her gun. Then, he asked appellant, "what happened tonight, and her reply was I don't want to talk about it right now." At that point, Paton claimed he "didn't ask [appellant] anything else." Thus, appellant's assertion was "scrupulously honored" for almost three hours, until a different investigator, Ruel, sought to question appellant after again advising her of her *Miranda* rights. At that time, Freeman agreed to waive her rights.

In sum, appellant's statement, "I don't want to talk about it *right now*," did not "destroy *all* lines of communication nor make a prelude by the defendant absolutely necessary...." *Latimer*, 49 Md.App. at 588, 433 A.2d 1234. Consistent with *Mosley*, a reasonable period of time elapsed between appellant's invocation of her right to silence (Statement 4), and the interrogation conducted by Ruel. Although the locale and the topic were the same, the interrogator was different.

It was not until Ruel asked appellant if she would write out her statement, or allow it to be recorded, that appellant invoked her right to counsel. By then, she had already given an oral statement. There is no contention that, once appellant invoked her right to counsel, that right was violated. Accordingly, the court did not err in denying appellant's motion to suppress on the basis of a *Miranda* violation.

## B. Prompt Presentment

Claiming a violation of the prompt presentment rule, appellant contends that the court erred in denying her suppression motion. As noted, appellant was arrested at around 8:00 p.m. on March 30, 2000, and was presented to the Commissioner about twelve hours later, at about 8 a.m. on March 31, 2000.

Appellant points out that, immediately after her arrest, when she indicated that she did not want to talk, Paton ceased his questioning. However, the interrogation resumed about three hours later. Freeman asserts: "There was no explanation ... for the delay [in presentment] between 8:00 p.m. and 11:00 p.m., other than for the sole purpose of Corporal Ruel's interrogation." After Ruel's interview, an eight hour delay ensued, but appellant did not provide a statement during that period of time. Appellant states:

Such unnecessary delay, designed for the sole purpose of interrogation, is a critical factor in the voluntariness determination. There was no reason why appellant should not have been brought in front of a District Court Commissioner shortly after her arrest at 8:00 p.m. .... The additional eight-hour delay between the time the second interrogation concluded and the time appellant was brought before the District Court Commissioner was explained as a delay for administrative purposes and the convenience of the Commissioner. Neither of these reasons, however, adequately explain the necessity for an eight-hour delay.

Relying on *Williams v. State*, 375 Md. 404, 825 A.2d 1078 (2003); *Facon v. State*, 375 Md. 435, 825 A.2d 1096 (2003); and *Hiligh v. State*, 375 Md. 456, 825 A.2d 1108 (2003), all filed on the same date, appellant insists that "[r]eversal in the instant

case is mandated because the circuit court failed to apply the 'very heavy weight' standard to this factor during the suppression hearing when considering the admissibility of Statement No. 5," in which appellant admitted killing her boyfriend.[11]

At oral argument, appellant primarily focused on the three-hour period between her arrest at 8 p.m. and the beginning of her interrogation at 11 p.m. Appellant asserted that the police had "enough" to charge her by 11:00 p.m., and that the delay was "for the sole purpose" of interrogating her. Moreover, she argued that there was no evidence to justify the State's three-hour delay, given that Ruel's explanation pertained only to the delay from midnight to 8:00 a.m.[12] And, because the trilogy constitutes a "watershed change" in the law, appellant maintained that the court below did not apply the requisite "heavy weight" standard to the delay. According to appellant, any delay, however brief, is subject to the heavy weight standard if it was for the sole purpose of interrogation.

In the question presented in her brief, appellant challenges only the denial of her motion to suppress. However, in the argument section of her brief, appellant also complains that "the trial court erred by failing to instruct the jury to apply 'very heavy weight' to this factor when considering the voluntariness of the appellant's statements to Corporal Ruel."

The State contends that, to the extent appellant's presentment argument "turns on . . . instruction to the jury regarding a 'very heavy weight' standard," it is not preserved because appellant did not except to the court's instructions on that ground. The State also argues that "[t]he brief delay here

---

11. The Court of Appeals's "trilogy" had not been decided by the time of the suppression hearing in this case. Although appellant's counsel never used the phrase "very heavy weight" in her argument at the suppression hearing, defense counsel clearly complained about the delay in presentment.

12. Based on our review of the record, we disagree with appellant's contention that the explanation for the delay pertained only to the period after midnight.

was necessary to obtain Freeman's medication and food, and then to determine what, if any, charges should be brought against her. Freeman's announcement that she had just shot someone, even when taken with a report of a shooting, is not sufficient for charging."

██ With respect to the jury instructions, appellant asked the court to propound Maryland Criminal Pattern Jury Instruction 3:18, concerning the factors pertinent to the issue of voluntariness of a statement. The court instructed largely in accordance with the pattern instruction. However, it omitted factor 8 of the pattern instruction, pertaining to "whether the defendant was taken before a district court commissioner without unnecessary delay following arrest and, if not, whether that affected the voluntariness of the statement." Appellant's counsel did not except to the omission, however. Rather, she objected only to the court's inclusion of language involving a defendant's mental deficiency, which was included pursuant to the State's request. And, in her closing argument, defense counsel challenged the voluntariness of appellant's statements, but she did not argue that Freeman's statements were involuntary because of a delay in presentment. Therefore, assuming that appellant has attempted in her brief to raise a challenge to the jury instruction, we agree with the State that it is not preserved. *See* Maryland Rule 4–325(e); *Reynolds v. State* 327 Md. 494, 502, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993) (cautioning defense counsel to "be precise when they craft [suppression] motions.... It is an attorney's obligation to present with clarity all issues that must be resolved by a trial judge...."); *Southern v. State,* 140 Md.App. 495, 505, 780 A.2d 1228 (2001) (noting that "failure to raise a suppression issue before the hearing court amounts to a waiver"; "motion to suppress must be presented with particularity in order to preserve an objection."), *rev'd on other grounds,* 371 Md. 93, 807 A.2d 13 (2002); *Russell v. State,* 138 Md.App. 638, 646, 773 A.2d 564 (2001) (stating that argument not presented to suppression court is not preserved), *cert. dismissed,* 368 Md. 43, 791 A.2d 941 (2002). Therefore, we shall address appel-

lant's prompt presentment contention solely in the context of the suppression motion.

 We begin our analysis with a review of Maryland Rule 4–212(f). It states, in part: "When a defendant is arrested without a warrant, the defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest." The rule "reduces the risk that a confession will be coerced during a custodial interrogation conducted before the accused is advised of his rights by a district court commissioner." *Faulkner v. State*, 156 Md.App. 615, 651, 847 A.2d 1216 (2004).

Maryland Code (2002 Repl.Vol.), § 10–912 of the Courts & Judicial Proceedings Article ("C.J."), is also pertinent. It states:

### § 10–912. Failure to take defendant before judicial officer after arrest.

(a) *Confession not rendered inadmissible.*—A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) *Effect of failure to comply strictly with Title 4 of the Maryland Rules.*—Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

On June 13, 2003, the Court of Appeals decided three cases involving delay in presentment as a factor in the analysis of the voluntariness of a defendant's confession: *Williams*, 375 Md. 404, 825 A.2d 1078; *Facon*, 375 Md. 435, 825 A.2d 1096; and *Hiligh*, 375 Md. 456, 825 A.2d 1108. Although the case *sub judice* was tried before those cases were decided, the holdings in those cases "appl[y] to cases tried before the decisions were rendered." *Odum v. State*, 156 Md.App. 184, 194, 846 A.2d 445 (2004).

 "[T]he purpose of prompt presentment is to provide a defendant with a full panoply of safeguards." *Facon,* 375 Md. at 447, 825 A.2d 1096. "Presentment ... serves four vital functions." *Williams,* 375 Md. at 418, 825 A.2d 1078. These include, *id.,*

> the determination of whether sufficient probable cause exists for continued detention; determination of eligibility for pre-trial release; informing the accused of the charges against him, his right to counsel, and, if indigent, his right to appointed counsel; and, if the charge is beyond the jurisdiction of the District Court, his right to a preliminary hearing.

To be sure, "[m]any factors can bear on the voluntariness of a confession." *Id.* at 429, 825 A.2d 1078. The *Williams* Court addressed "the deliberate and unnecessary violation of an accused's right to prompt presentment" as one of the factors "that may not be coercive as a matter of law but that need to be given special weight whenever they exist." *Id.* at 430, 825 A.2d 1078. *See Hof v. State,* 337 Md. 581, 596–97, 655 A.2d 370 (1995)(noting that delay in presentment is one of the factors relevant to voluntariness). The *Williams* Court reasoned that prompt presentment is "a right designed to provide the defendant with a clear explanation of more basic Constitutional and statutory rights", 375 Md. at 430, 825 A.2d 1078, and a violation of that right "must be given special weight in determining voluntariness...." *Id.* This is because "when the right it is designed to protect is transgressed, there may be no practical way of calculating the actual effect of the transgression." *Id.*

*Williams* involved a delay in presentment of 47 hours. The defendant was arrested at 4:10 a.m. on July 30, 2000, as a robbery suspect. Following his arrest, Williams was treated at a hospital for injuries. He was interviewed upon his return to the station, beginning at 9:25 a.m. By 12:42 p.m., Williams had confessed to two robberies. During the questioning, the police discovered that Williams was also named in three homicide warrants; a homicide detective began questioning Williams at 1:23 p.m. on July 30, 2000. Williams was finally presented to the Commissioner at 3:07 a.m. on August 1, 2000.

The Court recognized that, within about four hours after his interrogation began (i.e., more than eight hours after his arrest), the police "had all of the basic information they needed to ·present [Williams] to a Commissioner" on the two robbery charges. *Id.* at 423, 825 A.2d 1078. It observed, *id.* at 424, 825 A.2d 1078:

There were no apparent administrative functions to be performed that required further questioning, and, to the extent there were any, it does not appear that the ensuing questioning was for that purpose. The homicides had been committed on July 21–nine days earlier. Petitioner had already been charged in at least one of them. There was no concern about possible harm to other people or property, and it does not appear that the police were focusing on the identity or location of other persons. Petitioner was not questioned about an accomplice until sometime after 10:21 a.m. on July 31, some 21 hours after the homicide interrogations began.

In the Court's view, "[t]he sole, unadulterated purpose of the subsequent interrogation was to obtain incriminating statements[.]" *Id.* It held that such a purpose was "not a proper basis upon which to delay presentment." *Id.* at 424, 825 A.2d 1078. With regard to the effect on voluntariness of a delay that has as its sole purpose an interrogation seeking incriminating statements, the Court said:

[I]f the police ... deliberately delay presentment in order to conduct a custodial interrogation, any resulting confession must be regarded as laden with suspicion. *The violation of the Rule in such a circumstance will have to be given very heavy weight, by both the suppression court and by the trier of fact, in determining the overall voluntariness of the confession.* Obviously, the longer any unlawful delay, the greater is the weight that must be given to the prospect of coercion.

*Id.* at 433, 825 A.2d 1078 (emphasis added).

Articulating a "heavy weight standard," the Court said:

We shall conclude that, while the statute makes a delay in presentment only one factor in determining voluntariness and admissibility, not all factors that may weigh on voluntariness are necessarily equal in import, and that, when the delay is not only violative of the Rule but deliberate and designed for the sole purpose of soliciting a confession, it must be given *very heavy weight.* There is no indication that, with respect to the statements regarding the three murders, the trial court gave the continued delay such weight. When we do so, it becomes clear that those latter statements were involuntary and therefore inadmissible.

*Id.* at 416, 825 A.2d 1078 (emphasis added).

Accordingly, the Court concluded that the robbery confessions were both voluntary and admissible, but that the statements as to the murders were neither voluntary nor admissible. It said, *id.* at 434, 825 A.2d 1078:

We hold that any deliberate and unnecessary delay in presenting an accused before a District Court Commissioner, in violation of Rule 4–212(e) or (f) must be given very heavy weight in determining whether a resulting confession is voluntary, because that violation creates its own aura of suspicion. The violation does not, of itself, make the confession involuntary or inadmissible. It remains a factor to be considered, along with any others that may be relevant, but it must be given very heavy weight.

Nevertheless, *Williams* recognized that some delay is reasonable, if not inevitable. As to the interrogation for the robberies, the Court pointed out that Williams "was not effectively available for questioning" until after he was treated at the hospital. *Id.* at 423, 825 A.2d 1078. Moreover, the Court said that, upon William's return to the station, "[i]t was entirely appropriate at that point for the police to engage in preliminary questioning" for the purpose of obtaining "some basic information about their suspect and even about his involvement in the two robberies, so that he could be properly identified and charged." *Id.* Noting that questioning began within ten minutes and "promptly produced oral confessions to

the two robberies", *id.*, the Court also said that "[i]t was not then inappropriate for the police to seek a written statement, to confirm the oral admissions, which they also did promptly." *Id.*

In *Hiligh*, 375 Md. 456, 825 A.2d 1108, the Court granted post-conviction relief based on ineffective assistance of trial counsel. At trial, the defense attorney failed to challenge a delay of almost 24 hours in presentment, which called into question the voluntariness of Hiligh's robbery confession. Referring to its decision in *Williams*, the *Hiligh* Court reiterated that, "when a delay in presentment was not only unnecessary but deliberate and for the sole purpose of extracting incriminating statements, it must be given special weight by a suppression court." *Id.* at 472, 825 A.2d 1108.

The Court noted that the defendant was taken to the police station at 10:58 p.m. on March 20, 1995, and "[a]t 10:30 p.m., 23 hours and 32 minutes after he was first brought to the station, petitioner was taken before a District Court Commissioner." *Id.* at 461–62, 825 A.2d 1108. Yet, "the police had all of the information and had completed all of the administrative paperwork necessary to present [Hiligh] to a District Court Commissioner by 3:30 a.m. on March 21, at the latest, . . . ." *Id.* at 473, 825 A.2d 1108. Therefore, the Court determined that "[a]ll delay after that point, as a matter of both law and fact, was unnecessary." *Id.* It reasoned that, had the defense attorney asked, the suppression court would have been required "to give that delay very heavy weight and examine whether the State had shouldered its heavy burden of proving that the confession was not induced by that coercion." *Id.* at 474, 825 A.2d 1108.

Further, the *Hiligh* Court stated, *id.* at 474–75, 825 A.2d 1108 (footnote omitted):

On this record . . . there is, indeed, a substantial possibility that the court, in ruling on the suppression motion, would have found the confession involuntary and ruled it inadmissible. Even if the judge had allowed the confession into evidence, he would, under *Williams*, have been required, on

request, to instruct the jury on the heavy weight to be accorded any deliberate and unnecessary delay. Furthermore, had counsel argued that point to the jury, there is the same substantial possibility that the jury would have found the confession involuntary and, in accordance with the judge's other instructions, disregarded it.

*Facon*, 375 Md. 435, 825 A.2d 1096, is the remaining case in the trilogy. In that case, measured from the time when the accused was brought from Washington, D.C. to Maryland, there was a twelve hour delay in his presentment to a Commissioner. The Court found that "[t]he delay was solely for the purpose of interrogation," *id.* at 453, 825 A.2d 1096, and therefore the defendant was entitled to have the suppression court "accord such violation very heavy weight in considering whether [defendant's] confession was voluntary." *Id.* at 454, 825 A.2d 1096.

Relying on its decision in *Williams,* the *Facon* Court determined that the prompt presentment rule had been violated, even though presentment occurred within 24 hours of the defendant's arrival in Maryland. *Facon*, 375 Md. at 453, 825 A.2d 1096. As the motion court had considered only the time that the defendant spent with the interrogating officer, rather than the total time spent in custody in Maryland, the Court reversed the judgment of conviction and remanded for a new trial. *Id.* at 454, 825 A.2d 1096.

Several recent decisions of this Court have addressed the trilogy discussed above. We turn to explore these cases.

In *Perez v. State,* 155 Md.App. 1, 841 A.2d 372 (2004), Perez was convicted of two counts of felony murder and related charges. On appeal, he claimed, *inter alia,* that his statements to the police should have been suppressed because of a delay of 48 hours in his presentment to a Commissioner. *Id.* at 15, 841 A.2d 372. This Court, sitting *en banc, id.* at 19, 841 A.2d 372, vacated Perez's convictions and remanded for further proceedings, to allow the trial court to ascertain the proper standard in regard to its voluntariness determination. *Id.* at 31, 841 A.2d 372.

Perez signed several *Miranda* waivers during the period in issue. And, on two occasions, he executed a prompt presentment waiver. *Id.* at 9–10, 841 A.2d 372. The detectives asked Perez a series of questions and he responded, in part, that he "voluntarily agreed to remain at the station for additional questioning. . . ." *Id.* at 10, 841 A.2d 372. Following an evidentiary hearing, the circuit court denied Perez's motion to suppress his statements. *Id.* at 13, 841 A.2d 372. On appeal, we noted that the suppression court did not make any factual findings required for meaningful appellate review. *Id.* at 26, 841 A.2d 372. Furthermore, because neither *Williams*, *Hiligh*, nor *Facon* had been decided at the time of the suppression hearing, *id.* at 27, 841 A.2d 372, we were of the view that a new suppression hearing was required, so that the suppression court, as part of its totality of the circumstances analysis with respect to voluntariness, could determine whether the heavy weight standard applied "as a matter of law as well as fact." *Id.* at 28, 841 A.2d 372. Accordingly, the *Perez* Court concluded, *id.* at 31, 841 A.2d 372:

> [A] delay in presentment, even of the type that meets the heavy weight standard, cannot be the sole reason for finding involuntariness. Additionally, it is worth repeating that the ultimate issue is voluntariness. Voluntariness is determined by the totality of the circumstances and compliance with the presentment rule is one factor. Since *Williams*, if it is determined that one of the factors is deliberate noncompliance with the prompt presentment requirement for the sole purpose of obtaining a confession, that factor is to be given very heavy weight.

*Odum*, 156 Md.App. 184, 846 A.2d 445, followed *Perez*. There, the defendant was convicted of kidnapping. *Id.* at 188, 846 A.2d 445. On appeal, he challenged, *inter alia*, the trial court's refusal to suppress his statements to police as involuntary, *id.* at 191, 846 A.2d 445, because of a delay of about thirty hours in his presentment to the Commissioner. *Id.* at 203, 846 A.2d 445.

At 11:00 a.m. on June 26, 2001, Odum was arrested and taken to the police station, where "[a] Commissioner is avail-

able ... twenty-four hours a day." *Id.* at 195, 846 A.2d 445. "Odum was placed in an interview room at 11:30 a.m." *Id.* He was given food, beverages, and cigarettes, and was permitted to use the bathroom. *Id.* Odum was left alone in the room until 5:40 p.m., when a corporal entered and took several photos of him. *Id.* At 6:52 p.m. Odum was advised of and waived his *Miranda* rights. *Id.* Then, he was left alone in the interview room from 9:10 p.m. on June 26, 2001, until 1:00 a.m. on June 27, 2001. *Id.* at 196, 846 A.2d 445. At that time, a homicide detective entered the room. *Id.* Odum signed a second waiver of *Miranda* rights at about 2:00 a.m. *Id.* Between 2:00 a.m. and 4:00 a.m., Odum completed a written statement. *Id.* At 1:56 p.m., Odum "was taken to a holding cell near the Commissioner's hearing room...." *Id.* At 3:00 p.m. on June 27, while in the holding cell, Odum was served with a statement of charges. *Id.* He was then taken before the Commissioner at 6:12 p.m. *Id.* at 197, 846 A.2d 445.

This Court observed: "In rejecting [Odum's] motion to suppress, the circuit court's ruling from the bench does not reflect consideration of whether any special weight should be given to any part of the delay." *Id.* at 193–94, 846 A.2d 445 (footnote omitted). Accordingly, we held: "[B]ecause of the absence of specific factual findings necessary to determine the weight to be afforded the delay in presenting Odum before a Commissioner in the voluntariness analysis, we vacate and remand for a new suppression hearing and a new trial." *Id.* at 188, 846 A.2d 445.

Writing for this Court, Judge Rodowsky elucidated several "general concepts" from the trilogy. He wrote, *id.* at 202–03, 846 A.2d 445:

First, because the concern is with delay in presentment that affects the voluntariness of a statement given during custodial interrogation, a delay that can have no effect on the voluntariness of a statement is immaterial to suppression....

Second, some delays are necessary. These present no violation of Rule 4–212(e) or (f) and do not weigh in any

degree against voluntariness in the suppression court's evaluation process.

\* \* \*

Third, there may be delays which are unnecessary, and thereby violative of Rule 4–212(e) and (f), but which are not for the sole purpose of custodial interrogation. These delays must be weighed against voluntariness, but they do not require "very heavy" weight against voluntariness in that evaluation. Our analysis in the instant matter calls these delays "Class I."

Fourth, there are unnecessary delays, violative of Rule 4–212(e) and (f), which are deliberately for the sole purpose of custodial interrogation. Our analysis refers to this type of unnecessary delay as "Class II." A suppression court is required to weigh a Class II delay "very heavily" against voluntariness in its evaluation of a resulting statement's admissibility.

Fifth, although subjecting the arrestee to actual interrogation is the best evidence that that part of a delay in presentment is for the sole purpose of custodial interrogation, a delay, depending on the facts, may be for the sole purpose of custodial interrogation, although unaccompanied by actual interrogation.

*Faulkner v. State, supra,* 156 Md.App. 615, 847 A.2d 1216, is also useful. There, we considered the defendant's complaint with respect to a delay in presentment of seven and a half hours, when the questioning concluded three and a half hours after the initial *Miranda* advisement. *Id.* at 650, 653, 847 A.2d 1216. Writing for this Court, Judge Adkins said: "[W]e do not read [the trilogy] as a blanket instruction to grant new trials whenever the police interview a suspect before presentment." *Id.* at 652, 847 A.2d 1216. *Faulkner* made clear "that some reasonable and necessary delay" may occur because of "police questioning designed to determine whether to charge the suspect, and for what crime." *Id.* The *Faulkner* Court also recognized that a delay in presentment may be necessary

"in order to question the suspect . . . [when] the police have received information suggesting that there may have been a self defense justification for the shooting." *Id.* at 653, 847 A.2d 1216.

The Court concluded that "the detectives were entitled to question Faulkner about his involvement in the crime for which he had been arrested, in an effort to determine whether he had information bearing on their decision to charge him. . . ." *Id.* at 654, 847 A.2d 1216. Moreover, we pointed out that "much of the total time between arrest and present-ment was consumed by legitimate investigative and adminis-trative tasks" that have been "explicitly approved as 'neces-sary.'" *Id.* (citing *Williams,* 375 Md. at 423, 825 A.2d 1078; *Hof,* 337 Md. at 596–97, 655 A.2d 370). We stated, *id.* at 654, 655 A.2d 370:

> The interval between Faulkner's arrest and his presentment reflected reasonable and necessary delay for further investi-gation (via the search of Faulkner's home and questioning him) regarding his involvement and degree of culpability, before charging papers were drawn up, as well as reason-able and necessary delay for administrative procedures (*i.e.,* "processing" and preparing the charging papers). We hold that the delay in presentment concerns addressed in *Williams* do not warrant a new trial in Faulkner's case.

*Perez, Odum,* and *Faulkner* recognize that the trilogy does not stand for the proposition that all delay is prohibited. To the contrary, "some delays are necessary", and "[t]hese pres-ent no violation of Rule 4–212 . . . and do not weigh in any degree against voluntariness. . . ." *Odum,* 156 Md.App. at 202, 846 A.2d 445. Indeed, acknowledging that some delay is unavoidable, the *Williams* Court illustrated that point with the following examples:

> "(1) to carry out reasonable routine administrative proce-dures such as recording, fingerprinting and photographing; (2) to determine whether a charging document should be issued accusing the arrestee of a crime; (3) to verify the commission of the crimes specified in the charging docu-

ment; (4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; (5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime."

375 Md. at 420, 825 A.2d 1078 (quoting *Johnson v. State*, 282 Md. 314, 329, 384 A.2d 709 (1978)).

 As appellant seems to concede, the period between the end of the interrogation at midnight and her presentation before the Commissioner at 8:00 a.m. is not relevant, even if the delay was unnecessary or deliberate, because appellant did not make any statements during this time period. Even if a delay is unnecessary and violative of Rule 4–212, it does not receive "very heavy weight" in the analysis of voluntariness, unless the delay was "deliberately for the sole purpose of custodial interrogation." *Odum*, 156 Md.App. at 203, 846 A.2d 445. And, as *Odum* underscores, a deliberate delay is irrelevant with regard to voluntariness if the statement in issue was made before the period of delay. *Id.* at 202, 208, 846 A.2d 445. Therefore, appellant is left to focus on the three-hour delay, from the time of her arrest at about 8:00 p.m. until Ruel's interrogation began at about 11:00 p.m.

When appellant entered the barracks at about 8:00 p.m., she announced that she had just shot someone and that she had the gun in her purse. Appellant's admission that she shot someone was not enough, by itself, to warrant bringing charges against appellant. Paton did not know who appellant had shot; the status of the victim; whether appellant was telling the truth; whether she was under the influence of any substance; whether appellant suffered from a psychiatric condition; or whether she had acted in self-defense. Clearly, it was incumbent on the police to conduct at least a preliminary investigation, process appellant, and complete essential paperwork and other administrative duties. Moreover, during the

initial three hour period, the police learned that appellant needed her blood pressure medication, and went to her home to retrieve it. The police also obtained food for appellant from a fast food restaurant. Significantly, there was no evidence presented at the hearing suggestive of a deliberate delay in presentment for the sole purpose of obtaining a statement from appellant.

At about 10:55 p.m., some three hours after Freeman's arrest, Ruel advised appellant of her *Miranda* rights and then questioned her about the incident. Although the interrogation concluded at around midnight, appellant was not brought to the Commissioner until 8:00 a.m. the next day. Explaining the reasons for that delay, Ruel stated: "Basically for the completion of paperwork, the processing of the actual finger-print, photograph, and also the Commissioner wasn't coming in until the following morning." However, contrary to appellant's suggestion, Ruel did not indicate that his explanation pertained only to the period from midnight to 8:00 a.m. Thus, the record does not support appellant's claim that there was no explanation for the three-hour delay.

In any event, if the police had not completed the paperwork and processing of appellant until after midnight, as appellant suggests, that argument does not help appellant. If the police were not finished with their administrative duties by midnight, then they obviously were not finished with them during the three hour period in issue, from 8:00 p.m. to 11:00 p.m.

Accordingly, we discern no error in the court's finding that, "under the totality of the circumstances," there was no reason to suppress the evidence based on a delay in presentment. Although the court did not use the words "heavy weight" in its analysis (because the trilogy had not yet been decided), it would have no reason to do so, because there was no evidence that the delay was deliberately occasioned for the sole purpose of seeking to interrogate appellant. *Odum*, 156 Md.App. at 202–03, 846 A.2d 445.

**JUDGMENT OF THE CIRCUIT COURT FOR CALVERT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

Concurring Opinion by MOYLAN, Judge.

I fully concur not only in the result reached by the majority opinion but in the painstakingly thorough and analytically incisive discussion of the *Miranda* issues. I also have no quarrel with any of the specific statements made with respect to the alleged violation of the prompt presentment rule and the impact that such a violation might, under currently prevailing law, have on traditional common law voluntariness.

I write separately only to express my chagrin at what I believe to be a totally unnecessary "spinning of wheels" by both appellate courts over the course of the last fourteen months over an issue that seems to me to be meaningless. Both courts seem to be obsessed (one proactively and the other responsively) with whether a suppression hearing judge, in weighing the totality of factors that go into the ultimate determination of voluntariness, has given sufficiently "heavy weight" to a violation of the prompt presentment rule, if such should be found to have occurred (that finding, of course, being subject to the clearly erroneous standard of appellate review). I am dumbfounded as to why an appellate court should care what weight a suppression hearing judge gave to any factor, because the appellate court is enjoined to weigh the factors for itself.

I begin with the analysis of Judge Harrell for the Court of Appeals in *Winder v. State*, 362 Md. 275, 765 A.2d 97 (2001), an opinion that has deservedly become the primer for the standards and the procedures for handling challenges to the voluntariness of confessions in Maryland. As to the proper standard of appellate review of a trial judge's determination that a confession was voluntary, the Court of Appeals, through Judge Harrell, stated unequivocally:

> The trial court's determination regarding whether a confession was made voluntarily is a mixed question of law and

fact. As such, *we undertake a de novo review of the trial judge's ultimate determination on the issue of voluntariness.*

362 Md. at 310–11, 765 A.2d 97 (emphasis supplied). See also *Gilliam v. State,* 320 Md. 637, 647, 579 A.2d 744 (1990); *Lodowski v. State,* 307 Md. 233, 255–56, 513 A.2d 299 (1986); *Perez v. State,* 155 Md.App. 1, 26, 841 A.2d 372 (2004); *Uzzle v. State,* 152 Md.App. 548, 579–80, 832 A.2d 869 (2003).

On the ultimate issue of voluntariness, the appellate court, taking as a given those first-level findings of fact that are not clearly erroneous and, in resolving ambiguities, taking that version of the evidence most favorable to the prevailing party, writes on a clean slate with respect to its *de novo* weighing. On that issue, it is not marking the paper of the suppression hearing judge, but is making its own independent decision on the basis of the factors that have been factually established.

Even if the suppression hearing judge weighed the factors with impeccable correctness, he is not home free. The independent *de novo* determination of the appellate court might still go in the opposite direction. Even if the suppression hearing judge, on the other hand, weighed the factors with flagrant disregard of *Williams–Hiligh–Facon,* a reversal or a remand does not necessarily follow. The independent *de novo* determination of the appellate court, presumably adhering faithfully to *Williams–Hiligh–Facon,* might nonetheless make the same determination. Whatever the suppression hearing judge does in the weighing process, rightly or wrongly, will not therefore be dispositive of the final outcome, if the appellate court is truly going to make its own independent *de novo* determination. The suppression hearing judge, right or wrong, has been by-passed. If that be true, it makes no difference whether, in some other world without *de novo* review, he might have been right or wrong. The appellate *de novo* determination has superseded his decision and thereby made his weighing of the factors irrelevant.

In this case, of course, there was no violation of the prompt presentment rule and there was no occasion for anyone to give

it any weight, great or small. I find it mind-boggling, nonetheless, that whenever the names *Williams–Hiligh–Facon* are even whispered, bench and bar lock into the mind set of the Hans Christian Anderson fairy tale "The Emperor's New Clothes." Everyone stands at curbside, cheering lustily as the *Williams–Hiligh–Facon* troika prances imperially down the street, and no one dares to speak the self-evident truth, "The Emperor has no clothes."